Justice Souter
delivered the opinion of the Court.
This case calls for specific application of the standard of reasonable competence required on the part of defense counsel by the Sixth Amendment. We hold that even when a capital defendant’s family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial.
I
On the morning of January 14, 1988, James Scanlon was discovered dead in a bar he ran in Allentown, Pennsylvania, his body having been stabbed repeatedly and set on fire. Ronald Rompilla was indicted for the murder and related offenses, and the Commonwealth gave notice of intent to ask *378 for the death penalty. Two public defenders were assigned to the case.
The jury at the guilt phase of trial found Rompilla guilty on all counts, and during the ensuing penalty phase, the prosecutor sought to prove three aggravating factors to justify a death sentence: that the murder was committed in the course of another felony; that the murder was committed by torture; and that Rompilla had a significant history of felony convictions indicating the use or threat of violence. See 42 Pa. Cons. Stat. §§ 9711(d)(6), (8), (9) (2002). The Commonwealth presented evidence on all three aggravators, and the jury found all proven. Rompilla’s evidence in mitigation consisted of relatively brief testimony: five of his family members argued in effect for residual doubt, and beseeched the jury for mercy, saying that they believed Rompilla was innocent and a good man. Rompilla’s 14-year-old son testified that he loved his father and would visit him in prison. The jury acknowledged this evidence to the point of finding, as two factors in mitigation, that Rompilla’s son had testified on his behalf and that rehabilitation was possible. But the jurors assigned the greater weight to the aggravating factors, and sentenced Rompilla to death. The Supreme Court of Pennsylvania affirmed both conviction and sentence. Commonwealth v. Rompilla, 539 Pa. 499, 653 A. 2d 626 (1995).
In December 1995, with new lawyers, Rompilla filed claims under the Pennsylvania Post Conviction Relief Act, 42 Pa. Cons. Stat. § 9541 et seq. (2004), including ineffective assistance by trial counsel in failing to present significant mitigating evidence about Rompilla’s childhood, mental capacity and health, and alcoholism. The postconviction court found that trial counsel had done enough to investigate the possibilities of a mitigation case, and the Supreme Court of Pennsylvania affirmed the denial of relief. Commonwealth v. Rompilla, 554 Pa. 378, 721 A. 2d 786 (1998).
*379 Rompilla then petitioned for a writ of habeas corpus under 28 U. S. C. §2254 in Federal District Court, raising claims that included inadequate representation. The District Court found that the State Supreme Court had unreasonably applied Strickland v. Washington, 466 U. S. 668 (1984), as to the penalty phase of the trial, and granted relief for ineffective assistance of counsel. The court found that in preparing the mitigation case the defense lawyers had failed to investigate “pretty obvious signs” that Rompilla had a troubled childhood and suffered from mental illness and alcoholism, and instead had relied unjustifiably on Rompilla’s own description of an unexceptional background. Rompilla v. Horn, No. CIV.A.99-737 (ED Pa., July 11, 2000), App. 1307-1308.
A divided Third Circuit panel reversed. Rompilla v. Horn, 355 F. 3d 233 (2004). The majority found nothing unreasonable in the state court’s application of Strickland, given defense counsel’s efforts to uncover mitigation material, which included interviewing Rompilla and certain family members, as well as consultation with three mental health experts. Although the majority noted that the lawyers did not unearth the “useful information” to be found in Rompilla’s “school, medical, police, and prison records,” it thought the lawyers were justified in failing to hunt through these records when their other efforts gave no reason to believe the search would yield anything helpful. 355 F. 3d, at 252. The panel thus distinguished Rompilla’s case from Wiggins v. Smith, 539 U. S. 510 (2003). Whereas Wiggins’s counsel failed to investigate adequately, to the point even of ignoring the leads their limited enquiry yielded, the Court of Appeals saw the Rompilla investigation as going far enough to leave counsel with reason for thinking further efforts would not be a wise use of the limited resources they had. But Judge Sloviter’s dissent stressed that trial counsel’s failure to obtain relevant records on Rompilla’s background was owing to the lawyers’ unreasonable reliance on *380 family members and medical experts to tell them what records might be useful. The Third Circuit denied rehearing en banc by a vote of 6 to 5. Rompilla v. Horn, 359 F. 3d 310 (2004).
We granted certiorari, 542 U. S. 966 (2004), and now reverse.[1]
II
Under 28 U. S. C. § 2254, Rompilla’s entitlement to federal habeas relief turns on showing that the state court’s resolution of his claim of ineffective assistance of counsel under Strickland v. Washington, supra, “resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,” § 2254(d)(1). An “unreasonable application” occurs when a state court “‘identifies the correct governing legal principle from this Court’s decisions but unreasonably applies that principle to the facts’ of petitioner’s case.” Wiggins v. Smith, supra, at 520 (quoting Williams v. Taylor, 529 U. S. 362, 413 (2000) (opinion of O’Connor, J.)). That is, “the state court’s decision must have been [not only] incorrect or erroneous [but] objectively unreasonable.” Wiggins v. Smith, supra, at 520-521 (quoting Williams v. Taylor, supra, at 409 (internal quotation marks omitted)).
Ineffective assistance under Strickland is deficient performance by counsel resulting in prejudice, 466 U. S., at 687, with performance being measured against an “objective standard of reasonableness,” id., at 688, “under prevailing professional norms,” ibid.; Wiggins v. Smith, supra, at 521. This case, like some others recently, looks to norms of adequate investigation in preparing for the sentencing phase of a capital trial, when defense counsel’s job is to counter the *381 State’s evidence of aggravated culpability with evidence in mitigation. In judging the defense’s investigation, as in applying Strickland generally, hindsight is discounted by pegging adequacy to “counsel’s perspective at the time” investigative decisions are made, 466 U. S., at 689, and by giving a “heavy measure of deference to counsel’s judgments,” id., at 691.
A
A standard of reasonableness applied as if one stood in counsel’s shoes spawns few hard-edged rules, and the merits of a number of counsel’s choices in this case are subject to fair debate. This is not a case in which defense counsel simply ignored their obligation to find mitigating evidence, and their workload as busy public defenders did not keep them from making a number of efforts, including interviews with Rompilla and some members of his family, and examinations of reports by three mental health experts who gave opinions at the guilt phase. None of the sources proved particularly helpful.
Rompilla’s own contributions to any mitigation case were minimal. Counsel found him uninterested in helping, as on their visit to his prison to go over a proposed mitigation strategy, when Rompilla told them he was “bored being here listening” and returned to his cell. App. 668. To questions about childhood and schooling, his answers indicated they had been normal, ibid., save for quitting school in the ninth grade, id., at 677. There were times when Rompilla was even actively obstructive by sending counsel off on false leads. Id., at 663-664.
The lawyers also spoke with five members of Rompilla’s family (his former wife, two brothers, a sister-in-law, and his son), id., at 494, and counsel testified that they developed a good relationship with the family in the course of their representation, id., at 669, 729. The state postconvietion court found that counsel spoke to the relatives in a “detailed manner,” attempting to unearth mitigating information, id., at 264, although the weight of this finding is qualified by the *382 lawyers’ concession that “the overwhelming response from the family was that they didn’t really feel as though they knew him all that well since he had spent the majority of his adult years and some of his childhood years in custody,” id., at 495; see also id., at 669. Defense counsel also said that because the family was “coming from the position that [Rom-pilla] was innocent. . . they weren’t looking for reasons for why he might have done this.” Id., at 494.
The third and final source tapped for mitigating material was the cadre of three mental health witnesses who were asked to look into Rompilla’s mental state as of the time of the offense and his competency to stand trial. Id., at 473-474, 476. But their reports revealed “nothing useful” to Rompilla’s ease, id., at 1358, and the lawyers consequently did not go to any other historical source that might have cast light on Rompilla’s mental condition.
When new counsel entered the case to raise Rompilla’s postconviction claims, however, they identified a number of likely avenues the trial lawyers could fruitfully have followed in building a mitigation case. School records are one example, which trial counsel never examined in spite of the professed unfamiliarity of the several family members with Rompilla’s childhood, and despite counsel’s knowledge that Rompilla left school after the ninth grade. Id., at 677. Other examples are records of Rompilla’s juvenile and adult incarcerations, which counsel did not consult, although they were aware of their client’s criminal record. And while counsel knew from police reports provided in pretrial discovery that Rompilla had been drinking heavily at the time of his offense, Lodging to App. 111-120 (hereinafter Lodging), and although one of the mental health experts reported that Rompilla’s troubles with alcohol merited further investigation, App. 723-724, counsel did not look for evidence of a history of dependence on alcohol that might have extenuating significance.
Before us, trial counsel and the Commonwealth respond to these unexplored possibilities by emphasizing this Court’s *383 recognition that the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste. See Wiggins v. Smith, 539 U. S., at 525 (further investigation excusable where counsel has evidence suggesting it would be fruitless); Strickland v. Washington, supra, at 699 (counsel could “reasonably surmise . . . that character and psychological evidence would be of little help”); Burger v. Kemp, 483 U. S. 776, 794 (1987) (limited investigation reasonable because all witnesses brought to counsel’s attention provided predominantly harmful information). The Commonwealth argues that the information trial counsel gathered from Rompilla and the other sources gave them sound reason to think it would have been pointless to spend time and money on the additional investigation espoused by postconviction counsel, and we can say that there is room for debate about trial counsel’s obligation to follow at least some of those potential lines of enquiry. There is no need to say more, however, for a further point is clear and dispositive: the lawyers were deficient in failing to examine the court file on Rompilla’s prior conviction.
B
There is an obvious reason that the failure to examine Rompilla’s prior conviction file fell below the level of reasonable performance. Counsel knew that the Commonwealth intended to seek the death penalty by proving Rompilla had a significant history of felony convictions indicating the use or threat of violence, an aggravator under state law. Counsel further knew that the Commonwealth would attempt to establish this history by proving Rompilla’s prior conviction for rape and assault, and would emphasize his violent character by introducing a transcript of the rape victim’s testimony given in that earlier trial. App. 665-666. There is no question that defense counsel were on notice, since they acknowledge that a “plea letter,” written by one of them four days *384 prior to trial, mentioned the prosecutor’s plans. Ibid. It is also undisputed that the prior conviction file was a public document, readily available for the asking at the very courthouse where Rompilla was to be tried.
It is clear, however, that defense counsel did not look at any part of that file, including the transcript, until warned by the prosecution a second time. In a colloquy the day before the evidentiary sentencing phase began, the prosecutor again said he would present the transcript of the victim’s testimony to establish the prior conviction.
“[DEFENSE]: I would also like to review whatever he’s going to read from.
“[PROSECUTOR]: Well, I told you that I was going to do this a long time ago. You certainly had the opportunity to review the Transcript.
“[DEFENSE]: Well, I would like a copy of this.
“[PROSECUTOR]: I don’t think that’s my duty to provide you with a copy. That’s a public record, and you could have gotten that Transcript at any time prior to this Trial. I made one copy for myself, and I’d like to have it now.
“[DEFENSE]: Well, Judge, then I’m going to need to get a copy of it. I’m going to need to get a copy of it.” Id., at 32, 36.[2]
*385 At the postconviction evidentiary hearing, Rompilla’s lawyer confirmed that she had not seen the transcript before the hearing in which this exchange took place, id., at 506-507, and crucially, even after obtaining the transcript of the victim’s testimony on the eve of the sentencing hearing, counsel apparently examined none of the other material in the file.[3]
With every effort to view the facts as a defense lawyer would have done at the time, it is difficult to see how counsel could have failed to realize that without examining the readily available file they were seriously compromising their opportunity to respond to a case for aggravation. The prosecution was going to use the dramatic facts of a similar prior offense, and Rompilla’s counsel had a duty to make all reasonable efforts to learn what they could about the offense. Reasonable efforts certainly included obtaining the Commonwealth’s own readily available file on the prior conviction to learn what the Commonwealth knew about the crime, to discover any mitigating evidence the Commonwealth would downplay, and to anticipate the details of the aggravating *386 evidence the Commonwealth would emphasize.[4] Without making reasonable efforts to review the file, defense counsel could have had no hope of knowing whether the prosecution was quoting selectively from the transcript, or whether there were circumstances extenuating the behavior described by the victim. The obligation to get the file was particularly pressing here owing to the similarity of the violent prior offense to the crime charged and Rompilla’s sentencing strategy stressing residual doubt. Without making efforts to learn the details and rebut the relevance of the earlier crime, a convincing argument for residual doubt was certainly beyond any hope.[5]
*387 The notion that defense counsel must obtain information that the State has and will use against the defendant is not simply a matter of common sense. As the District Court points out, the American Bar Association Standards for Criminal Justice in circulation at the time of Rompilla’s trial describes the obligation in terms no one could misunderstand in the circumstances of a case like this one:
“It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused’s admissions or statements to the lawyer of facts constituting guilt or the accused’s stated desire to plead guilty.” 1 ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.).[6]
“[W]e long have referred [to these ABA Standards] as ‘guides to determining what is reasonable.’” Wiggins v. Smith, 539 U. S., at 524 (quoting Strickland v. Washington, 466 U. S., at 688), and the Commonwealth has come up with no reason to think the quoted standard impertinent here.[7]
*388 At argument the most that Pennsylvania (and the United States as amicus) could say was that defense counsel’s efforts to find mitigating evidence by other means excused them from looking at the prior conviction file. Tr. of Oral Arg. 37-39, 45-46. And that, of course, is the position taken by the state postconviction courts. Without specifically discussing the prior case file, they too found that defense eoun- *389 sel’s efforts were enough to free them from any obligation to enquire further. Commonwealth v. Rompilla, No. 682/ 1988 (Pa. Ct. Common Pleas, Aug. 28, 1996), App. 263-264, 272-273.
We think this conclusion of the state court fails to answer the considerations we have set out, to the point of being an objectively unreasonable conclusion. It flouts prudence to deny that a defense lawyer should try to look at a file he knows the prosecution will cull for aggravating evidence, let alone when the file is sitting in the trial courthouse, open for the asking. No reasonable lawyer would forgo examination of the file thinking he could do as well by asking the defendant or family relations whether they recalled anything helpful or damaging in the prior victim’s testimony. Nor would a reasonable lawyer compare possible searches for school reports, juvenile records, and evidence of drinking habits to the opportunity to take a look at a file disclosing what the prosecutor knows and even plans to read from in his case. Questioning a few more family members and searching for old records can promise less than looking for a needle in a haystack, when a lawyer truly has reason to doubt there is any needle there. E.g., Strickland, supra, at 699. But looking at a file the prosecution says it will use is a sure bet: whatever may be in that file is going to tell defense counsel something about what the prosecution can produce.
The dissent thinks this analysis creates a “rigid, per se” rule that requires defense counsel to do a complete review of the file on any prior conviction introduced, post, at 404 (opinion of Kennedy, J.), but that is a mistake. Counsel fell short here because they failed to make reasonable efforts to review the prior conviction file, despite knowing that the prosecution intended to introduce Rompilla’s prior conviction not merely by entering a notice of conviction into evidence but by quoting damaging testimony of the rape victim in that case. The unreasonableness of attempting no more than they did was heightened by the easy availability of the file *390 at the trial courthouse, and the great risk that testimony about a similar violent crime would hamstring counsel’s chosen defense of residual doubt. It is owing to these circumstances that the state courts were objectively unreasonable in concluding that counsel could reasonably decline to make any effort to review the file. Other situations, where a defense lawyer is not charged with knowledge that the prosecutor intends to use a prior conviction in this way, might well warrant a different assessment.
C
Since counsel’s failure to look at the file fell below the line of reasonable practice, there is a further question about prejudice, that is, whether “there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” 466 U. S., at 694. Because the state courts found the representation adequate, they never reached the issue of prejudice, App. 265, 272-273, and so we examine this element of the Strickland claim de novo, Wiggins v. Smith, 539 U. S., at 534, and agree with the dissent in the Court of Appeals. We think Rompilla has shown beyond any doubt that counsel’s lapse was prejudicial; Pennsylvania, indeed, does not even contest the claim of prejudice.
If the defense lawyers had looked in the file on Rompilla’s prior conviction, it is uncontested they would have found a range of mitigation leads that no other source had opened up. In the same file with the transcript of the prior trial were the records of Rompilla’s imprisonment on the earlier conviction, App. 508, 571, 631, which defense counsel testified she had never seen, id., at 508. The prison files pictured Rompilla’s childhood and mental health very differently from anything defense counsel had seen or heard. An evaluation by a corrections counselor states that Rompilla was “reared in the slum environment of Allentown, Pa. vicinity. He early came to [the] attention of juvenile authorities, quit *391 school at 16, [and] started a series of incarcerations in and out Penna. often of assaultive nature and commonly related to over-indulgence in alcoholic beverages.” Lodging 40. The same file discloses test results that the defense’s mental health experts would have viewed as pointing to schizophrenia and other disorders, and test scores showing a third grade level of cognition after nine years of schooling. Id., at 32-35.[8]
The accumulated entries would have destroyed the benign conception of Rompilla’s upbringing and mental capacity defense counsel had formed from talking with Rompilla himself and some of his family members, and from the reports of the mental health experts. With this information, counsel would have become skeptical of the impression given by the five family members and would unquestionably have gone further to build a mitigation case. Further effort would presumably have unearthed much of the material postconviction counsel found, including testimony from several members of Rompilla’s family, whom trial counsel did not interview. Judge Sloviter summarized this evidence:
“Rompilla’s parents were both severe alcoholics who drank constantly. His mother drank during her preg *392 nancy with Rompilla, and he and his brothers eventually developed serious drinking problems. His father, who had a vicious temper, frequently beat Rompilla’s mother, leaving her bruised and black-eyed, and bragged about his cheating on her. His parents fought violently, and on at least one occasion his mother stabbed his father. He was abused by his father who beat him when he was young with his hands, fists, leather straps, belts and sticks. All of the children lived in terror. There were no expressions of parental love, affection or approval. Instead, he was subjected to yelling and verbal abuse. His father locked Rompilla and his brother Richard in a small wire mesh dog pen that was filthy and excrement filled. He had an isolated background, and was not allowed to visit other children or to speak to anyone on the phone. They had no indoor plumbing in the house, he slept in the attic with no heat, and the children were not given clothes and attended school in rags.” 355 F. 3d, at 279 (dissenting opinion) (citations omitted).
The jury never heard any of this and neither did the mental health experts who examined Rompilla before trial. While they found “nothing helpful to [Rompilla’s] case,” Rompilla, 554 Pa., at 385, 721 A. 2d, at 790, their postconviction counterparts, alerted by information from school, medical, and prison records that trial counsel never saw, found plenty of “‘red flags’” pointing up a need to test further. 355 F. 3d, at 279 (Sloviter, J., dissenting). When they tested, they found that Rompilla “suffers from organic brain damage, an extreme mental disturbance significantly impairing several of his cognitive functions.” Ibid. They also said that “Rompilla’s problems relate back to his childhood, and were likely caused by fetal alcohol syndrome [and that] Rom-pilla’s capacity to appreciate the criminality of his conduct or to conform his conduct to the law was substantially impaired at the time of the offense.” Id., at 280 (Sloviter, J., dissenting).
*393 These findings in turn would probably have prompted a look at school and juvénile records, all of them easy to get, showing, for example, that when Rompilla was 16 his mother “was missing from home frequently for a period of one or several weeks at a time.” Lodging 44. The same report noted that his mother “has been reported . . . frequently under the influence of alcoholic beverages, with the result that the children have always been poorly kept and on the filthy side which was also the condition of the home at all times.” Ibid. School records showed Rompilla’s IQ was in the mentally retarded range. Id., at 11, 13, 15.
This evidence adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury, and although we suppose it is possible that a jury could have heard it all and still have decided on the death penalty, that is not the test. It goes without saying that the undiscovered “mitigating evidence, taken as a whole, ‘might well have influenced the jury’s appraisal’ of [Rompilla’s] culpability,” Wiggins v. Smith, 539 U. S., at 538 (quoting Williams v. Taylor, 529 U. S., at 398), and the likelihood of a different result if the evidence had gone in is “sufficient to undermine confidence in the outcome” actually reached at sentencing, Strickland, 466 U. S., at 694.
The judgment of the Third Circuit is reversed, and Pennsylvania must either retry the case on penalty or stipulate to a life sentence.

It is so ordered.

 Because we reverse on ineffective-assistance grounds, we have no occasion to consider Rompilla’s other claim, under Simmons v. South Carolina, 512 U. S. 154 (1994). It is enough to say that any retrial of Rompilla’s sentence will be governed by the Simmons line of cases.

 A similar exchange took place at the same hearing about the indictment in the record of Rompilla’s prior conviction.
“[DEFENSE]: Well, I think we need to look at the Indictment then. If he’s charged with committing the Burglary-
“[PROSECUTOR]: I had a copy, and I forgot to bring it up with me.
“[COURT]: All right.
“[DEFENSE]: Can we see it, Judge?
“[COURT]: Sime, he’s going to get it.
“[PROSECUTOR]: It’s a public record . . . you could have gone over [sic] lunch and looked at it just like I did.” App. 28.

 Defense counsel also stated at the postconviction hearing that she believed at some point she had looked at some files regarding that prior conviction and that she was familiar with the particulars of the case. But she could not recall what the files were or how she obtained them. Id., at 507-508. In addition, counsel apparently obtained Rompilla’s rap sheet, which showed that he had prior convictions, including the one for rape. Id., at 664. At oral argument, the United States, arguing as an amicus in support of Pennsylvania, maintained that counsel had fulfilled their obligations to investigate the prior conviction by obtaining the rap sheet. Tr. of Oral Arg. 44-45. But this cannot be so. The rap sheet would reveal only the charges and dispositions, being no reasonable substitute for the prior conviction file. The dissent nonetheless concludes on this evidence that counsel knew all they needed to know about the prior conviction. Post, at 401 (opinion of Kennedy, J.). Given counsel’s limited investigation into the prior conviction, the dissent’s parsing of the record seems generous to a fault.

 The ease with which counsel could examine the entire file makes application of this standard correspondingly easy. Suffice it to say that when the State has warehouses of records available in a particular case, review of counsel’s performance will call for greater subtlety.

 This requirement answers the dissent’s and the United States’s contention that defense counsel provided effective assistance with regard to the prior conviction file because it argued that it would be prejudicial to allow the introduction of the transcript. Post, at 402; Brief for United States as Amicus Curiae 29. Counsel’s obligation to rebut aggravating evidence extended beyond arguing it ought to be kept out. As noted above, supra this page, counsel had no way of knowing the context of the transcript and the details of the prior conviction without looking at the file as a whole. Counsel could not effectively rebut the aggravation case or build their own case in mitigation.
Nor is there any merit to the United States’s contention that further enquiry into the prior conviction file would have been fruitless because the sole reason the transcript was being introduced was to establish the aggravator that Rompilla had committed prior violent felonies. Brief for United States as Amicus Curiae 30. The Government maintains that because the transcript would incontrovertibly establish the fact that Rom-pilla had committed a violent felony, the defense could not have expected to rebut that aggravator through further investigation of the file. That analysis ignores the fact that the sentencing jury was required to weigh aggravating factors against mitigating factors. We may reasonably assume that the jury could give more relative weight to a prior violent felony aggravator where defense counsel missed an opportunity to argue that circumstances of the prior conviction were less damning than the prosecution’s characterization of the conviction would suggest.

 The new version of the Standards now reads that any “investigation should include efforts to secure information in the possession of the prosecution and law enforcement authorities” whereas the version in effect at the time of Rompilla’s trial provided that the “investigation” should always include such efforts. ABA Standards for Criminal Justice, Prosecution Function and Defense Function 4-4.1 (3d ed. 1993). We see no material difference between these two phrasings, and in any case cannot think of any situation in which defense counsel should not make some effort to learn the information in the possession of the prosecution and law enforcement authorities.

 In 1989, shortly after Rompilla’s trial, the ABA promulgated a set of guidelines specifically devoted to setting forth the obligations of defense counsel in death penalty cases. ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989) (hereinafter 1989 *388 ABA Guidelines or Guideline). Those Guidelines applied the dear requirements for investigation set forth in the earlier Standards to death penalty cases and imposed a similarly forceful directive: “Counsel should make efforts to secure information in the possession of the prosecution or law enforcement authorities, including police reports.” Guideline 11.4.1.D.4. When the United States argues that Rompilla’s defense counsel complied with these Guidelines, it focuses its attentions on a different Guideline, 11.4.1.D.2. Brief for United States as Amicus Curiae 20-21. Guideline 11.4.1.D.2 concerns practices for working with the defendant and potential witnesses, and the United States contends that it imposes no requirement to obtain any one particular type of record or information. Ibid. But this argument ignores the subsequent Guideline quoted above, which is in fact reprinted in the appendix to the United States’s brief, that requires counsel to “‘make efforts to secure information in the possession of the prosecution or law enforcement authorities.’” App. to id., at 4a.
Later, and current, ABA Guidelines relating to death penalty defense are even more explicit:
“Counsel must. . . investigate prior convictions ... that could be used as aggravating circumstances or otherwise come into evidence. If a prior conviction is legally flawed, counsel should seek to have it set aside. Counsel may also find extenuating circumstances that can be offered to lessen the weight of a conviction.” ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.7, comment. (rev. ed. 2003), reprinted in 31 Hofstra L. Rev. 913, 1027 (2003) (footnotes omitted).
Our decision in Wiggins made precisely the same point in citing the earlier 1989 ABA Guidelines. 539 U. S., at 524 (“The ABA Guidelines provide that investigations into mitigating evidence ‘should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor’” (quoting 1989 ABA Guideline 11.4.1.C; emphasis in original)). For reasons given in the text, no such further investigation was needed to point to the reasonable duty to look in the file in question here.

 The dissent would ignore the opportunity to find this evidence on the ground that its discovery (and the consequent analysis of prejudice) “rests on serendipity,” post, at 405. But once counsel had an obligation to examine the file, counsel had to make reasonable efforts to learn its contents; and once having done so, they could not reasonably have ignored mitigation evidence or red flags simply because they were unexpected. The dissent, however, assumes that counsel could reasonably decline even to read what was in the file, see post, at 406 (if counsel had reviewed the case file for mitigating evidence, “[t]here would have been no reason for counsel to read, or even to skim, this obscure document”). While that could well have been true if counsel had been faced with a large amount of possible evidence, see n. 4, supra, there is no indication that examining the case file in question here would have required significant labor. Indeed, Pennsylvania has conspicuously failed to contest Rompilla’s claim that because the information was located in the prior conviction file, reasonable efforts would have led counsel to this information.