*599 GREGORY, Circuit Judge,
concurring in part and dissenting in part:
Blakeney contends that he was prejudiced by trial counsel’s failure to interview and present mitigating evidence from several witnesses who were available and willing to testify at the sentencing proceeding.[1] I agree and, therefore, dissent from the majority’s denial of relief on Blake-ney’s claim that his trial counsel rendered ineffective assistance during the sentencing phase of the trial. I concur in the majority’s judgment to deny Blakeney relief on his other claims.
Trial counsel’s ineffectiveness was prejudicial because their lack of investigation deprived Blakeney of witness testimony that was crucial to his mitigation defense. They did not call Blakeney’s wife, five of his six siblings, or members of his community as witnesses. Although trial counsel’s decision not to call character witnesses is a strategic one to which enormous deference is owed, United States v. Terry, 366 F.3d 312, 317 (4th Cir.2004), we are not obliged to give such deference when, as here, counsel’s conduct is unreasonable and unjustifiable. If the Sixth Amendment is to have meaning, we cannot simply elevate counsel’s flawed performance to the status of strategy. This is especially so in capital sentencing proceedings.
During the sentencing phase of the trial, Blakeney’s trial counsel presented three lay witnesses and one expert, Dr. Mark Worthen. Two of the lay witnesses, correctional officers from the county jail, testified that Blakeney did not commit infractions while in jail. (J.A. 56-60.) The third lay witness, Peggy Blakeney Ratcliff, one of Blakeney’s six siblings, (J.A. 143-51) testified that their family was extremely poor and that Mr. Huntley, the victim, and Gracie Blakeney, Blakeney’s mother, often drank too much. (J.A. 146-51.) Trial counsel did not seek further testimony from Ms. Ratcliff about Blakeney’s background or Mr. Huntley as a stepfather.[2] The testimony of the three lay witnesses represented only twelve pages of the entire trial transcript. (J.A. 56-60, 143-51.) Crow, one of Blakeney’s attorneys, testified that he strategically chose to call only Ms. Rat-cliff as a witness because he knew her well.[3] (J.A.2217.)
Trial counsel stated that they did not want to put Blakeney’s wife on the stand for the strategic reason that she would highlight his drug use. Yet, evidence of Blakeney’s drug use was prevalent throughout the record without her testimony. The drug use was emphasized specifically in Dr. Worthen’s report, yet trial counsel thought that the doctor’s testimony was the most effective way to present mitigation evidence.
Blakeney’s wife could have presented evidence of their chaotic family life. She testified at the MAR hearing that her oldest daughter, age fourteen, was in a violent *600 relationship with her twenty-one-year-old husband, Aaron. When Blakeney came to his step-daughter’s aid, Aaron pulled a gun on him.[4] This was not the first time that things became physical in that household, yet Blakeney did not respond violently then or ever. (J.A. 1646-47.) This was important testimony to be heard in juxtaposition to Blakeney’s prior criminal record and the government’s attempt to portray Blakeney as a man prone to violence.
The majority’s characterization of the other five siblings’ testimony presented at the MAR hearing as cumulative is incorrect. All of Blakeney’s siblings were available and willing to be interviewed and provide unique testimony. Claree Blake-ney Griffin testified at the MAR hearing and offered a portrait of Blakeney quite different from that painted by the government. She described her brother as a gentle and giving man, testifying that when the father that abandoned all seven children became ill as an elderly man, it was Blakeney who traveled to stay with him and take care of him until “he got better on his feet.” (J.A. 1400.) Blakeney cooked, cleaned, and helped his father pay the bills. This was but one example of Blakeney’s actions that suppoi’ted Griffin’s testimony that her brother has a “good heart.” (J.A. 1402.)
Griffin’s testimony was corroborated by another sister, Catherine Taylor. Taylor added her own unique story to help describe why she thought her brother was a good person. When she was having personal problems, Blakeney offered to drive Taylor from North Carolina to Cleveland and then take the bus back. (J.A. 1602-OS.) She said that he was always there when she needed him. (Id.) It is mystifying that trial counsel disregarded the entire family, when the MAR transcript of Taylor’s testimony seemed to be especially coherent and believable.
Like his sisters’ testimony, Jimmy Blakeney’s (“Jimmy”) testimony could have helped his brother. Not only could Jimmy have corroborated Blakeney’s assertion that he had completed the DART program, but he also had his own unique story demonstrating Blakeney’s positive character traits. Jimmy lived next door to the Wilsons, an elderly couple whom Blakeney would take shopping and fishing. Blakeney also did chores and ran errands for the couple without compensation. (J.A. 1630.)
The majority did not explain how it was reasonable for trial counsel to discount five siblings, saying that they could not handle testifying, after meeting only one sibling, who seemed worthy of the stand. (Maj. Op. 590.) The information the family could have provided was vital because his family offered, among other things, an alternative portrayal to contrast the government’s image of a man who had thoughtless disregard for the elderly and personal suffering.
The MAR court stated that trial counsel talked to Blakeney’s family members and “sized them up” in order to decide who should testify for Blakeney. Counsel met Blakeney’s wife and mother and decided they did not have enough “composure” to testify. (Maj.Op. 590.) It is clear that trial counsel based their decision on the way that these women spoke and their level of education, calling it “composure.” In fact, it seems that after trial counsel met these women, they prejudged the rest of Blake-ney’s large family, deciding that if these women lacked “composure” then no one in his family was worth interviewing.
The majority appears to approve of Crow’s stated reason for not calling these family members: “I really had no prior contact with [them] ... [fit’s hard to make *601 a [really] good decision about something like that, with such short contact.” (Maj. Op. 590.) It is hard to believe that the majority was satisfied with this excuse given that Crow’s “short contact” with Blake-ney’s family members was the result of his failure to attempt to meet them. It is not clear whether counsel ignored Blakeney’s family because they lacked composure or because Crow “had no prior contact with them,” but each excuse is inadequate on its own and indefensible when joined with the other. How can it be reasonable to conclude that a person lacks composure without meeting him or her? Clearly, trial counsel’s excuses are unjustifiable.
In finding that trial counsel were reasonable in failing to interview and offer Blakeney’s family as witnesses, the MAR court stated:
Crow thought that defendant’s family members were “all good people,” but he also knew that none of them were “what you might call leading citizens of the community.” None of defendant’s family members held public office; none were members of any profession (e.g., ministers, lawyers, doctors, bankers.) Thus Crow did not call as witnesses at trial all of defendant’s brothers and sisters.
(J.A. 2221.) Needless to say, one need not be a minister, lawyer, doctor, or banker to be a respected or leading member of one’s community. All of the people who testified for Blakeney at the MAR hearing were hardworking members of the community and, with the exception of one, none had criminal records. Trial counsel prejudged these potential witnesses and discounted them because they did not have fancy letters after their names. The MAR court, district court, and majority called this strained reasoning “strategy,” and concluded that it satisfied Strickland. I disagree.
Even if trial counsel did not believe that Blakeney’s family members were “upstanding citizens” worthy of the stand, had trial counsel interviewed them they would have led to witnesses such as Union County Deputy Sheriff George Curtis Parker. Parker testified at the MAR hearing that he had known Blakeney all of his life, that the incident was “out of character” for Blakeney, and that he would have testified at the sentencing proceeding. (J.A. 1375-88.) Parker was a law enforcement officer with the Sheriffs Office for seventeen years before retiring. His testimony certainly would have been persuasive at the sentencing proceeding, because unlike the prison guards trial counsel presented at sentencing, Parker knew Blakeney’s family intimately and had known Blakeney personally since he was a boy. Given the nature of Parker’s close relationship with the family, a minimal amount of investigation would have led trial counsel to him. In fact, most of the information that would have aided in Blakeney’s mitigation defense could have been easily obtained.
The majority and the courts before it found Blakeney’s trial counsel effective because they accepted Crow’s decision to place all of the responsibility for mitigation investigation on Blakeney’s family: “I guess the bottom line, I talked to those people that came forward and I urged them — and I would have talked to anybody else, any other family member that had-had they brought along with them. It’s their family.” (J.A. 2220.) One must appreciate Crow’s honesty. He admitted that he allowed his mitigation investigation to begin and end with the efforts of Blake-ney’s family. He admitted that he was willing to talk to anyone provided they came to him, but forged no independent investigation despite the fact that such investigation could have revealed defense theories and character witnesses. This type of responsibility shifting has been rejected as ineffective in relevant case law.
*602 In Gray v. Branker, this Court did not allow trial counsel to rely on the petitioner’s failure to aid in his own defense. 529 F.3d 220, 225-26, 230 (4th Cir.2008) (finding that trial counsel was not allowed to rely on defendant’s instruction “not to spend another fing penny on this trial” because “he didn’t need a psychiatrist” and “[t]here was nothing wrong with him.”). In Rompilla v. Beard, the defendant told his trial counsel that his background was unexceptional, yet the Supreme Court did not allow trial counsel to end them investigation there. 545 U.S. 374, 381, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005). Investigation is as important to a proper defense as oral argument in court, and it is an especially essential element in the defense of a capital case. It is ironic that Blakeney’s counsel shifted responsibility for the investigation onto the same family that they determined lacked composure. Even a cursory evaluation of trial counsel’s performance reveals that it fell well below professional norms and greatly prejudiced Blakeney.
The majority stated that the MAR court drew favorable comparisons to three of our decisions, implying that the MAR court’s analysis was sound when it was not. (Maj. Op. 591-92.) Unlike in Tucker v. Ozmint, this Court cannot conclude that the “psychologist ... gave the jury a full picture of [the defendant’s] ... disturbing social history.” 350 F.3d at 441-42. Unlike the doctor in Tucker, Dr. Worthen could not have presented a full picture of Blakeney to the jury, because, as acknowledged, he lacked the complete picture. In this case, Blakeney’s family could have provided the full picture, but no one interviewed them to obtain it.
The MAR court and the majority correctly characterized Bacon v. Lee, where we stated:
“[C]ounsel could reasonably have concluded, based on their earlier investigation, that the evidence they had developed ... would give the jury an accurate picture of [the petitioner’s] ... personality and that further investigation into ... [the petitioner’s] background would not be fruitful.”
225 F.3d at 481. In contrast, here further investigation would certainly have been fruitful in developing Blakeney’s mitigation defense. Had trial counsel done even minimal investigation, they would have discovered that Blakeney’s family could have presented valuable information to the jury. This information would have supplemented the doctor’s testimony with mitigating evidence relating to Blakeney’s benevolent conduct, kind heart, and good character.
It is unclear how Byram is analogous, since this Court stated, “Unlike in Wiggins, ... counsel here spent considerable time developing a picture of [petitioner’s]. life.”[5] 339 F.3d at 210. The record reflects that trial counsel did not spend a *603 considerable amount of time developing a picture of Blakeney’s life. The cases cited by the MAR court, and relied upon by the majority, are inapposite to the case at bar.
The MAR court proffered, and the majority tacitly accepts, some troubling reasons to justify its finding that trial counsel was not ineffective in failing to interview Blakeney’s family. The court’s first stated reason for concluding that trial counsel’s failure to interview and call Blakeney’s family as character witnesses was not a “source of prejudice” was that “several of the witnesses demonstrated an obvious bias in favor of defendant based on then-past close familial relationship to him.” (Maj.Op. 592.) The MAR court seems to suggest that courts must discredit the testimony of family members who love the defendant. Is “obvious bias ... based on ... close familial relationship” not just a convoluted way of describing love? If this Court were to adopt the logic of the MAR court, then we would have to disregard the testimony of all family members even when, as here, they possess valuable mitigation evidence.
The court went on to state that “several of the witnesses based their opinion that defendant was a man of ‘good character’ on factors not normally considered to be indicia of good character.” (Id.) Yet as shown above, his siblings offered specific conduct as evidence to support their assertions that Blakeney had a kind heart and was a good person. Additionally, the court stated that “considerable evidence of record shows that defendant is not a man of good character (e.g., the evidence of his history of substance abuse and his commission of armed robbery, larceny, assault, arson, and murder).” (Id.) This is an especially troubling assertion. Under the court’s standard, no person with a history of criminal convictions and substance abuse could be considered a good person no matter how many years he was sober or how many good deeds he had done. Under the court’s standard, there would be no need to have character witnesses at all because if a man were convicted of a crime, he would be, per se, a man of bad character.
Most surprisingly, the court said, “[D]e-fendant did not introduce any significant evidence proving that he is in fact a man of good character.” (Id.) However, Blakeney presented fourteen character witnesses, many of whom said wonderful and unique things about him and supported their testimony with specific evidence. By the MAR court’s standard, it seems there is nothing Blakeney could have presented to demonstrate good character.
Finally, the MAR court justified its finding that Blakeney was not prejudiced by his counsel’s deficient performance by stating: “[E]vidence of record shows that after defendant completed the DART program while serving five years confinement and after he was placed on probation, defendant disregarded the lessons he should have learned and returned to the costly and debilitating practice of using illegal drugs.” (Id.) Blakeney, however, argues that he was prejudiced by Dr. Worthen’s statements doubting that he had completed the DART program because the prosecutor exploited it in closing argument to cast doubt on other aspects of his life. The MAR court’s conclusion that Blakeney was not prejudiced by the DART inference because he had relapsed is unpersuasive. Blakeney never claimed he was drug-free; he merely attempted to demonstrate that he had completed the DART program in an effort to rid himself of drugs. Although he was telling the truth about an important aspect of his mitigation defense, he was impugned at the sentencing proceeding as being a liar. This was clearly prejudicial.
Blakeney’s trial counsel’s failure to investigate is indefensible and led to a mea *604 ger mitigation defense: Dr. Worthen’s poorly informed diagnosis could not mitigate the evidence against Blakeney, his sister’s testimony was but a small piece of the full story his family could have provided, and the two correctional officers’ testimony paled in comparison to that of the Deputy Sheriff. Trial counsel admitted that the evidence on guilt was stacked against Blakeney, which only increased the necessity to develop the mitigation defense that was readily available if they had properly investigated the case, assessed the witnesses, and presented the evidence at the sentencing phase of the trial. Blake-ney was practically left defenseless at the sentencing proceeding. In this matter of life or death, the Sixth Amendment certainly requires more of counsel. Thus, I dissent.

. Evidence came in during the MAR hearing that the victim had physically abused Blake-ney’s mother and engaged in sexually inappropriate behavior with Blakeney’s sisters.

. Crow served as Ms. Ratcliff's counsel three or four years prior to Blakeney's trial. (J.A. 2217.)

. This is exactly what the victim did to Blake-ney in the underlying offense.

. In Byrain, we held that the petitioner had not shown that his trial counsel’s performance fell below an objective standard of reasonableness. Id. at 209. One member of Byram’s defense team logged 623.5 hours of pre-trial preparation while the other member met with Byram at least thirty times. Id. at 210. Blakeney's trial counsel logged a total of 506.47 hours working on Blakeney’s entire case. (J.A. 2167-69.) Most of trial counsel Crow’s hours were in court. Despite the fact that one member of Byram's defense team logged more hours in pre-trial preparation than the total of both of Blakeney’s defense attorneys during the entire case, this is not dispositive as we did not base our decision in Byram. merely on the number of hours logged by the attorneys. Byram's defense team hired a forensic psychologist and a forensic psychiatrist. Id. Byram's defense team carefully analyzed the findings of the doctors and decided not to present the testimony of either, which was a strategic decision based on the potentially prejudicial findings of the doctors. Id. Blakeney could only wish that his trial counsel had understood the potentially prejudicial effect of Dr. Worthen’s diagnosis and supplemented it with mitigation evidence.