# SUPREME COURT OF THE UNITED STATES

ANIBAL CANALES, JR. *v.* BOBBY LUMPKIN,
DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 20–7065.   Decided June 30, 2022

The petition for a writ of certiorari is denied.

JUSTICE SOTOMAYOR, dissenting from the denial of certiorari.

A jury sentenced Anibal Canales, Jr., to death without hearing any meaningful evidence about why life in prison might be punishment enough. The mitigating evidence put on by Canales' counsel was so thin that the prosecutor remarked in closing that it was "'an incredibly sad tribute that when a man's life is on the line, about the only good thing we can say about him is he's a good artist.'" *Canales* v. *Davis*, 966 F. 3d 409, 417 (CA5 2020) (Higginbotham, J., dissenting) (*Canales II*). In reality, whether to sentence Canales to death was a far more complicated question. Competent counsel would have told the jury of "a tragic childhood rife with violence, sexual abuse, poverty, neglect, and homelessness"; of Canales' kindness to his mother and sisters; and "of a man beset by PTSD, a failing heart, and the dangers of prison life" when he committed the crime for which he was sentenced to die. *Ibid.* The jury had no chance to balance this humanizing evidence against the State's case.

A divided panel of the Court of Appeals for the Fifth Circuit nonetheless held that defense counsel's deficient performance did not prejudice Canales. In the majority's view, the State's case was so weighty that this mitigating evidence would have made no difference. That was wrong, as

Judge Higginbotham fully explained in his dissent, *id.,* at 417–418, 420–428, and as our precedents make clear, see *Porter* v. *McCollum*, 558 U. S. 30, 41–42 (2009) (*per curiam*); *Rompilla* v. *Beard*, 545 U. S. 374, 390–393 (2005); *Wiggins* v. *Smith*, 539 U. S. 510, 536–537 (2003); *Williams* v. *Taylor*, 529 U. S. 362, 397–398 (2000).

The Constitution guarantees fundamental rights even to those who commit terrible crimes. Whether to impose the ultimate punishment of death is a complex judgment that requires viewing the defendant as a full and unique individual. Such careful consideration is impossible when incompetent defense counsel prevents the jury from hearing substantial mitigating evidence, leaving nothing to consider but the defendant's crimes. Here, there is more than a reasonable probability that the undisclosed mitigating evidence would have led at least one juror to choose life in prison rather than death. The legal errors of the majority below, involving life-or-death stakes, are so clear that I would summarily reverse.

## I
## A

The evidence uncovered during the federal habeas proceedings below shows the following. Anibal "Andy" Canales, Jr., was born in Waukegan, Illinois, on December 1, 1964. Electronic Case Filing in *Canales* v. *Director, Texas Dept. of Corrections*, No. 2:03–cv–00069 (ED Tex., Dec. 1, 2016) (ECF), Doc. 220–1, p. 3. His sister, Elizabeth, was born just over a year later. Canales' parents were alcoholics and his father was violent. After his parents split up, Canales' mother married Carlos Espinoza, who spent the next six years physically and sexually abusing Canales and Elizabeth. As Elizabeth stated, "'Andy had to strip sometimes to be beaten. . . . I remember seeing Andy lying naked, curled up in a ball, and Carlos hitting him as hard as he could with the buckle end of the belt. Carlos would beat

Andy until he had welts and bruises all over his body.'" *Id.,* at 26. When Canales was just six years old, Espinoza sexually assaulted him. Canales twice witnessed his stepfather rape his little sister and tried to intervene, only to receive further beatings.

Canales' mother, meanwhile, was largely absent. Canales' cousin, a child herself, babysat in exchange for beer and cigarettes. Canales began drinking when he was about 10. His family lived in dire poverty in neighborhoods where gang membership was common. Canales witnessed a man get shot to death in the street when he was only six. Around age eight or nine, Canales was forced to join the Latin Kings. He had been shot at and stabbed by the time he was 12.

Canales' mother eventually left Espinoza and moved to San Antonio with Elizabeth and Canales' half-sister, Gabriela. Canales, however, was sent to Houston to live with his father. Later that year, his father relocated to Laredo and the family made clear to Canales that he could not come. Completely abandoned by his parents, Canales fell deeper into crime and substance abuse. He was arrested for car theft at 13, and by 14 was an alcoholic.

Canales ultimately made his way to San Antonio, where he alternated between juvenile detention facilities, homelessness, and living with his mother in other families' homes. The family found more stable housing when his mother moved in with John Ramirez, but Ramirez was just another in a string of cruel father figures. Ramirez beat Canales' mother and Elizabeth when Canales, now in his late teens, was not around to stop him. In Elizabeth's words, "'Andy was too big to beat so I was safe whenever Andy was around.'" *Id.,* at 28. "'He was always brave when I needed him to be. I will forever be grateful for that. . . . We love him.'" *Id.,* at 16. Gabriela likewise observed that "'Andy had a kind heart and he loved my mom, me and Elizabeth a lot.'" *Id.,* at 37.

In 1983, when he was 18, Canales stole an income tax check from Ramirez. Ramirez insisted on prosecution. In Elizabeth's words, "'Ramirez wanted Andy out of the way and that is why he pursued Andy's prosecution for the stolen check. He wanted access to my mom and Gabriela and me. Andy was protective of all of us.'" *Id.,* at 31. That stolen check sent Canales to federal prison. Later that same year, he was convicted of theft and sexual assault, and received a 15-year sentence, during which he joined the Texas Syndicate prison gang.

Canales was paroled in 1990 and started building a new life. He did not drink excessively or use drugs, and instead was "'affectionate'" with his girlfriend and "'help[ed] out at home.'" *Id.,* at 38. The two discussed getting married. But two years into Canales' parole, his mother suffered a brain aneurysm, losing her motor function and ability to speak. Canales was devastated. He turned back to drugs and alcohol and his relationship ended. By 1993, he had been convicted of a second sexual assault, his parole was revoked, and he returned to prison.

Canales suffered a heart attack in prison and was placed on blood thinners, which caused him to bruise easily and bleed for hours if he sustained a cut. He could not defend himself, and other inmates knew it. When they discovered that Canales had prior sex offense convictions and had been a member of the Latin Kings, the Texas Syndicate ordered him killed. Canales' cellmate, Bruce Richards, was a leader in another prison gang, the Texas Mafia. Richards agreed to admit Canales to the Texas Mafia and made a deal with the Syndicate for his protection. Canales thus owed Richards his life.

Shortly thereafter, and on Richards' instruction, Canales helped kill an inmate named Gary Dickerson, who was blackmailing the gang. Richards also instructed Canales to write a note to another inmate exaggerating Canales' role in the murder. As Richards later explained, "'If [Canales]

refused to do what I told him[,] I would have sent him back to the Texas Syndicate, and he would be killed.'" *Canales II*, 966 F. 3d, at 418 (Higginbotham, J., dissenting).

## B

Canales was convicted of the killing, and the State sought the death penalty. At the sentencing phase, the State submitted documentary evidence of Canales' conviction for theft and multiple convictions for sexual assault. One of Canales' sexual assault victims testified that Canales approached her in a parking lot, told her he was a police officer and that she was under arrest, drove her to the woods, and raped her. *Id.,* at 413, 416. The State entered into evidence two letters from Canales, one asking the Texas Mafia to murder an inmate whom Canales believed was cooperating with the prosecution, and another that more vaguely threatened cooperators. *Canales* v. *Stephens*, 765 F. 3d 551, 560–561 (CA5 2014) (*per curiam*) (*Canales I*).

Defense counsel barely responded. By their own admission, "they did not conduct *any* mitigation investigation." *Id.,* at 569. They put on no evidence that the Texas Syndicate would have killed Canales had he not participated in the murder. Nor did the jury hear about the unspeakable, unrelenting cruelties Canales witnessed and suffered at the hands of those closest to him, or hear Canales' sisters testify that he protected them in their darkest hours. Instead, defense counsel called several inmates and officers who testified that Canales "did not cause trouble, had an aptitude for art, and received few visits from family, and that he had tried to stop inmates from fighting." *Canales II*, 966 F. 3d, at 413–414.

The entire sentencing proceeding lasted just a day. The jury returned a recommendation of death the next morning.

## II

After his conviction and sentence became final, Canales

sought state postconviction relief. Canales' state postconviction attorney failed to argue that Canales' trial counsel had provided ineffective assistance at the sentencing phase.

In federal habeas proceedings, Canales (now represented by competent counsel) argued that his trial counsel had provided ineffective assistance. The District Court dismissed that claim as procedurally defaulted. While Canales' appeal was pending, this Court decided *Trevino* v. *Thaler*, 569 U. S. 413 (2013), holding that a federal court may consider a substantial claim of ineffective assistance of trial counsel, even if not presented in state court, if the petitioner was effectively barred from asserting that claim until state postconviction proceedings, and the petitioner's counsel in those proceedings was also ineffective.

In light of *Trevino*, the Fifth Circuit found that there was cause to excuse the procedural default of Canales' claim that trial counsel was ineffective during the sentencing phase. The Fifth Circuit further held that Canales' trial counsel had rendered deficient performance during the sentencing phase, that Canales' claim that this deficient performance prejudiced him had "some merit," and that state postconviction counsel had been deficient for failing to raise this "substantial" trial-ineffectiveness claim. *Canales I*, 765 F. 3d, at 570–571.[1] The Fifth Circuit remanded to allow Canales a "chance to develop the factual basis" of his trial-ineffectiveness claim, as well as for the District Court to decide prejudice in the first instance. *Ibid.*

On remand, Canales' counsel sought funding to hire mitigation experts. Texas did not dispute that the District Court could consider expert mitigation evidence, but opposed the motion on the grounds that no amount of mitigat-

_____

[1] The Fifth Circuit found that Canales had not "established cause for the procedural default of his claim of ineffective assistance of trial counsel during the guilt phase," as opposed to the sentencing phase, "because the claim is not substantial." *Canales I*, 765 F. 3d, at 568.

ing evidence could overcome the aggravating evidence already in the record. The District Court granted the motion for funding, and Canales' counsel retained three mitigation experts who reviewed medical, legal, and prison records and examined Canales. As exhibits to his brief regarding prejudice, Canales attached three expert reports accompanied by affidavits that revealed, for the first time, the significant evidence of mitigation previously recounted. See *supra,* at 2–5.

Texas filed its own brief denying that Canales suffered any prejudice. In doing so, Texas did not argue that the District Court could not consider the mitigation evidence. Indeed, Texas recognized that it "would be difficult to refute Canales's assertion that the mitigation evidence counsel failed to present at trial paints a gripping picture of Canales's tragic, troubled childhood." ECF Doc. 228, at 17. Taking that evidence as a given, Texas nevertheless argued that the mitigation evidence "must be considered in conjunction with, and weighed against, the evidence in aggravation," and that the gripping picture painted by the mitigation evidence was outweighed by the aggravating evidence. *Ibid.*

The District Court agreed with Texas, characterizing Canales' evidence of "gang violence, alcohol, drugs, and physical and sexual abuse" as "double-edged" because it could "'be read by the jury to support, rather than detract, from his future dangerousness claim.'" ECF Doc. 237, at 19. The District Court concluded that the aggravating evidence "far outweigh[ed]" the mitigating evidence. *Id.,* at 17.

Canales sought a certificate of appealability from the Fifth Circuit. In opposition, Texas again did not argue that the District Court erred by considering Canales' evidence of mitigation. To the contrary, Texas argued that a district court "must consider whether, and to what extent, the unpresented evidence may be double-edged," and urged the Fifth Circuit not to "ignore the potential aggravating effect"

of Canales' new evidence.  Respondent-Appellee's Opposition to Motion for Certificate of Appealability in *Canales* v. *Davis*, No. 18–70009 (CA5), p. 29.  The Fifth Circuit granted a certificate of appealability.

Texas then argued in its appeal brief on the merits, for the first time, that the District Court erred by considering the three expert mitigation reports.  The Fifth Circuit did not decide this argument and recognized that Texas had previously "failed to object to the new evidence under 28 U. S. C. §2254(e)(2)." *Canales II*, 966 F. 3d, at 412, n. 1; see also *id.*, at 419 (Higginbotham, J., dissenting) ("The State offers no explanation for its election to fully participate in the district court in the development of evidence").  The Fifth Circuit instead affirmed on the grounds on which the District Court relied, namely, that Canales' "new mitigating evidence . . . does not outweigh the aggravating evidence" in the record.  *Id.,* at 414.

### III
### A

To establish prejudice, Canales must show a reasonable probability that the jury would have returned a different sentence but for his counsel's ineffectiveness.  See *Wiggins*, 539 U. S., at 536.  In judging whether he has done so, the court must consider "the totality of the available mitigation evidence" and "reweig[h] it against the evidence in aggravation." *Williams*, 529 U. S., at 397–398.  Because his death sentence required a unanimous jury, Tex. Code Crim. Proc. Ann., Art. 37.071 (Vernon 2000), Canales must demonstrate only "a reasonable probability that at least one juror would have struck a different balance" with the benefit of this mitigating evidence, *Wiggins*, 539 U. S., at 537. He has done so.

Here, jurors heard essentially nothing from Canales' trial counsel that would enable them to gauge accurately his moral culpability, as Texas law requires.  Now, thanks to

the efforts of Canales' federal habeas counsel (efforts that trial counsel, or at least state postconviction counsel, should have undertaken in the first instance), it is clear that the presentation before the jury was woefully deficient. Put simply, "there exists too much mitigating evidence that was not presented" to be ignored now. *Porter*, 558 U. S., at 44 (internal quotation marks omitted).[2]

This Court has repeatedly recognized that failing to put exactly this type of evidence before the jury casts irreparable doubt on the integrity of its recommendation of death. See *id.*, at 41 ("Had Porter's counsel been effective, the judge and jury would have learned of the 'kind of troubled history we have declared relevant to assessing a defendant's moral culpability,'" including a "childhood history of physical abuse"); *Rompilla*, 545 U. S., 391–392 ("'Rompilla's parents were both severe alcoholics who drank constantly. . . . He was abused by his father who beat him when he was young with his hands, fists, leather straps,

—————————

[2] Contrary to Texas' belated argument, see Brief in Opposition 16–20, 28 U. S. C. §2254(e)(2) poses no barrier to consideration of Canales' mitigation evidence. This Court recently held in *Shinn* v. *Martinez Ramirez*, 596 U. S. \_\_\_, \_\_\_ (2022) (slip op., at 13), that §2254(e)(2) precludes a district court from "consider[ing] evidence beyond the state-court record based on ineffective assistance of state postconviction counsel." Texas, however, waived (or at the very least forfeited) any §2254(e)(2) argument by "fail[ing] to object to the new evidence under 28 U. S. C. §2254(e)(2), only arguing it was unnecessary, not improper" before the District Court, as well as before the Fifth Circuit at the certificate-of-appealability stage. *Canales* v. *Davis*, 966 F. 3d 409, 412, n. 1 (2020).

Texas does not argue that §2254(e)(2) is immune to waiver or forfeiture, nor could it. This Court has concluded that another provision of the Antiterrorism and Effective Death Penalty Act, its statute of limitations, is not jurisdictional and therefore may be waived or forfeited. See *Day* v. *McDonough*, 547 U. S. 198, 205 (2006) (interpreting §2244(d)(1)). Like that provision, §2254(e)(2) does not "speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts." *Zipes* v. *Trans World Airlines, Inc.*, 455 U. S. 385, 394 (1982).

belts and sticks. All of the children lived in terror'"); *Wiggins*, 539 U. S., at 534–535 (noting the "powerful" mitigating effect of evidence of "severe privation and abuse in the first six years of [the defendant's] life while in the custody of his alcoholic, absentee mother," "physical torment, sexual molestation," and time "spent homeless"); *Williams*, 529 U. S., at 398 ("[T]he graphic description of Williams' childhood, filled with abuse and privation, . . . might well have influenced the jury's appraisal of his moral culpability").

To be sure, Canales committed several violent sexual assaults and "a cold and calculated gang-related murder, and he ha[d] a history of threatening and seeking murder." *Canales II*, 966 F. 3d, at 417. It is therefore "possible that [many jurors] could have heard" all the mitigating evidence obtained after trial "and still have decided on the death penalty." *Rompilla*, 545 U. S., at 393. Many judges reviewing Canales' petition may be sure that they would recommend death, were they sitting on a hypothetical jury that heard all this evidence.

But "that is not the test." *Ibid.* Even if the mitigating evidence "may not have overcome a finding of future dangerousness," it "might well have influenced the jury's appraisal of [Canales'] moral culpability." *Williams*, 529 U. S., at 398. Measured against "the totality of the available mitigation evidence," *id.*, at 397, which even the State characterized as painting a gripping picture of a tragic childhood, the State's evidence would have appeared dramatically different. "[T]here is a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U. S., at 537.

B

The Fifth Circuit reached a contrary conclusion largely by "fram[ing] the prejudice inquiry as a comparison of the facts here to the facts" in *Wiggins*, *Williams*, *Rompilla*, and *Porter*, and "faulting Canales's mitigating evidence for not

neatly aligning with the evidence in those cases." *Canales II*, 966 F. 3d, at 423 (Higginbotham, J., dissenting); see also *id.,* at 415–416, and nn. 2, 5 (majority opinion).

In *Andrus* v. *Texas*, 590 U. S. \_\_\_ (2020) (*per curiam*), this Court warned against exactly that approach, noting "that we have never before equated what was sufficient in *Wiggins* with what is necessary to establish prejudice." *Id.,* at \_\_\_, n. 6 (slip op., at 18, n. 6). Indeed, in *Wiggins* itself, the Court stressed that the defendant had shown more than enough to establish prejudice. See 539 U. S., at 537–538 (explaining that "the mitigating evidence in [that] case [was] stronger, and the State's evidence in support of the death penalty far weaker, than in *Williams*," where the Court also found prejudice). The same was true in *Rompilla*, where the defendant had "shown beyond any doubt that counsel's lapse was prejudicial." 545 U. S., at 390. It went "without saying that the undiscovered mitigating evidence . . . might well have influenced the jury's appraisal of Rompilla's culpability." *Id.,* at 393 (internal quotation marks and brackets omitted).

Nor do *Williams* and *Porter* set a lower bound for establishing prejudice. Each came to this Court on collateral review of a state court's decision on the merits, meaning that the mitigating evidence was so strong that no "fairminded juris[t] could disagree" that the relevant state courts erred by finding a lack of prejudice. *Harrington* v. *Richter*, 562 U. S. 86, 101 (2011) (internal quotation marks omitted); see *Williams*, 529 U. S., at 399; *Porter*, 558 U. S., at 40–44. Canales' claim, by contrast, warrants *de novo* review. See 966 F. 3d, at 420–421 (Higginbotham, J., dissenting). In any event, as Judge Higginbotham ably explained, the omitted evidence in this case is quite comparable to (and in some ways stronger than) the evidence in those prior cases. See *id.,* at 424–425.

No two capital defendants will ever be the same. "[T]hat

is precisely why" reviewing courts must "'reweigh' the evidence" themselves, focusing on the full picture of the individual before them, "to avoid the drift of precedent into a paint-by-numbers guide to prejudice." *Id.*, at 425.

\*    \*    \*

Canales' crimes were brutal, and he deserves just punishment. Under our Constitution, however, no person's crime is so terrible that he loses his right to the effective assistance of counsel. That is especially true when he faces execution. If the right to counsel means anything, it means that the State should not take someone's life when incompetent counsel failed to offer a meaningful mitigation defense.

The jury did not see the full picture of Anibal Canales when they sentenced him to die. The jury never heard "the voluminous mitigating evidence now before this Court," so it "could only assume that there was none." *Id.*, at 427. His life story was more than the "'sad tribute'" that he was a "'good artist.'" See *supra,* at 1. If the jurors had a richer understanding of the man before them, there is a more than reasonable probability that at least one would have found a lifetime in prison to suffice. Canales has been denied his right to put that evidence before the jury, first by ineffective counsel and now by the courts. I would summarily reverse.