**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 06-4604**

———————

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

BRIAN CONNER,

Defendant - Appellant,

and

CONVALESCENT TRANSPORTS, INCORPORATED,

Defendant.

———————

Appeal from the United States District Court for the Eastern District of North Carolina, at New Bern. Louise W. Flanagan, Chief District Judge. (4:04-cr-00027-FL-ALL)

———————

Argued: December 7, 2007      Decided: January 25, 2008

———————

Before MICHAEL and TRAXLER, Circuit Judges, and James P. JONES, Chief United States District Judge for the Western District of Virginia, sitting by designation.

———————

Affirmed by unpublished opinion. Judge Jones wrote the opinion, in which Judge Michael and Judge Traxler joined.

———————

**ARGUED:** Joseph Blount Cheshire, V, CHESHIRE, PARKER, SCHNEIDER, BRYAN & VITALE, Raleigh, North Carolina, for Appellant. Banumathi Rangarajan, Assistant United States Attorney, OFFICE OF THE UNITED

STATES ATTORNEY, Raleigh, North Carolina, for Appellee.  **ON BRIEF:** John Keating Wiles, CHESHIRE, PARKER, SCHNEIDER, BRYAN & VITALE, Raleigh, North Carolina, for Appellant.  George E. B. Holding, United States Attorney, Anne M. Hayes, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

JONES, Chief District Judge:

Appellant Brian Conner was convicted by a jury in the court below after a thirteen-day trial of multiple counts of health care fraud, 18 U.S.C.A § 1347 (West 2000), conspiracy to commit health care fraud, and obstruction of the criminal investigation of health care offenses, 18 U.S.C.A § 1518 (West 2000). He was sentenced on May 3, 2006, to a total term of imprisonment of 151 months. In his appeal, Conner seeks re-sentencing on the ground that the district court erred in properly calculating his guideline range under the advisory sentencing guidelines.

In particular, Conner argues that the district court (1) should not have increased his offense level for abuse of a position of trust pursuant to U.S. Sentencing Guidelines Manual ("USSG") § 3B1.3 (2005), and (2) erred in relying on the government's statistical evidence in calculating the amount of loss under USSG § 2B1.1(b). After a careful consideration of the record and the appellant's arguments, we find that his sentence must be affirmed.

I.

As part of the federal sentencing process, a district court must first correctly calculate the applicable guideline range established by the now-advisory sentencing guidelines. Gall v. United States, 128 S. Ct. 586, 596 (2007). When contested by the defendant, the government has the burden of proving by a

3

preponderance of the evidence the facts supporting an abuse of trust enhancement, see United States v. Hill, 322 F.3d 301, 307 (4th Cir. 2003), as well as the amount of loss, see United States v. Miller, 316 F.3d 495, 503 (4th Cir. 2003). The district court's factual determinations in calculating the guideline range are reviewed on appeal for clear error. Elliott v. United States, 332 F.3d 753, 761 (4th Cir. 2003).

In Conner's case, the district court conducted a two-day evidentiary hearing on the sentencing issues. Considering the evidence in the light most favorable to the government, the facts upon which the district court determined the guideline sentencing range are as follows.

In 1990 Conner, a certified emergency medical technician, became the owner and operator of Convalescent Transports, Inc. ("CTI"), a business providing ambulance and wheelchair transportation services to patients. The business was headquartered in Kinston, North Carolina, with offices in other North Carolina locations. In 1991 CTI became an authorized provider of reimbursed Medicare and Medicaid ambulance services.[1]

_____

[1]Medicare is a federal health care program principally for older Americans, administered by the U.S. Department of Health and Human Services, largely through delegation to private insurance companies. Medicaid is a federal health care program for those with insufficient financial resources, administered by state governments.

4

The Medicare and Medicaid programs both require a showing of medical necessity before they will reimburse providers for ambulance services.  A provider is required to complete an "Ambulance Call Report" that states the clinical conditions rendering the patient bed confined or otherwise justifying the patient's non-emergency transport by ambulance.  Beginning in 1999, Medicare required a physician's certificate stating the patient's condition and the reasons why the patient could not be transported by means other than ambulance, such as a less expensive wheelchair van.[2]

Most of the patients transported by CTI were nursing home residents.  CTI had as many as 300 employees and transported patients from at least fifty nursing homes.  It was Medicare's highest paid private ambulance service in North Carolina.  In the five-year period between 1997 and 2002, CTI received $19,446,572 from Medicare and Medicaid for ambulance transports.

Conner led the conspiracy to defraud Medicare and Medicaid. He and others under his supervision instructed CTI employees to falsify Ambulance Call Reports and other billing records to show medical necessity when none existed and provided training to CTI

---

[2]The evidence showed that the average round-trip cost of a wheelchair van trip was $35, as opposed to the average cost of an ambulance trip of $437.48.  (J.A. II-538.) In addition, for many nursing home residents, the nursing home itself is required by Medicaid to provide wheelchair van service and is paid for that service.

employees on the methods to be used in falsifying the records. Employees were instructed to transport all dialysis patients by ambulance regardless of their medical condition. After 1999, CTI falsified physicians' certifications by various means, including whiting out the dates of prior certifications and inserting different dates.

In the presentence investigation report ("PSR"), the authoring probation officer recommended that Conner receive a two-level increase in his offense level under USSG § 3B1.3 for abuse of a position of trust. In addition, the probation officer found that the loss arising from Conner's criminal conduct was more than $2,500,000 but not more than $7,000,000, thus resulting in an increase of eighteen levels under USSG § 2B1.1(b)(1)(J).[3]

Conner filed timely objections to both the abuse of trust enhancement and the amount of loss and these issues, along with others not raised in this appeal, were the subject of the sentencing hearing. The district court agreed that Conner was subject to the abuse of trust enhancement and found that the proper loss was within the range suggested in the PSR.

---

[3]With these recommendations, Conner had a Total Offense Level of thirty-two, which, with his Criminal History Category of I, resulted in a guideline range of 121 to 151 months imprisonment. See USSG ch. 5, pt. A. The sentence imposed was at the high end of this range. Aside from his attacks on the district court's guidelines determinations, Conner does not contend that his sentence of 151 months was unreasonable.

II.

Conner's first contention is that the district court was incorrect in applying the abuse of trust enhancement. Conner's argument is that the relationship between CTI and the victims of his offenses—the federal health care programs—was contractual and not fiduciary, and because he held no other position of trust, such as a physician or other professional person might, he is not subject to the enhancement.

Guideline 3B1.3 provides that "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase [the offense level] by 2 levels." USSG § 3B1.3. The commentary by the Sentencing Commission gives as examples of the appropriate application of this enhancement, "an embezzlement of a client's funds by an attorney serving as guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination." USSG § 3B1.3 cmt. n.1.

While Conner's victims were not the patients transported (indeed, they received the presumed benefit of ambulance rides) and thus the relationship is not analogous to those described in the Sentencing Commission's examples, we believe that under the facts of the case the district court did not err in applying the enhancement.

Reimbursed medical providers have been held subject to the abuse of trust enhancement by other circuits. See United States v. Erhart, 415 F.3d 965, 972-73 (8th Cir. 2005) (enhancement properly applied to chiropractor who submitted fraudulent bills to insurance companies); United States v. Hodge, 259 F.3d 549, 556 (6th Cir. 2001)(enhancement properly applied to manager and treating therapist who falsely billed insurance companies); United States v. Hoogenboom, 209 F.3d 665, 666, 671 (7th Cir. 2000) (enhancement properly applied to psychologist who falsely billed Medicare); United States v. Gieger, 190 F.3d 661, 663, 665 (5th Cir. 1999) (enhancement properly applied to ambulance transportation service provider who made fraudulent claims to Medicare); United States v. Iloani, 143 F.3d 921, 922-23 (5th Cir. 1998) (enhancement properly applied to chiropractor who submitted fraudulent claims to insurance companies). Indeed, we have upheld the abuse of trust enhancement applied to a nursing home operator who perpetrated a fraud scheme against Medicaid. United States v. Bolden, 325 F.3d 471, 504-05 (4th Cir. 2003).

Conner seeks to distinguish our Bolden decision from his case because in Bolden the nursing home operator received prospective payments from Medicaid, subject to later cost reporting by the operator. Id. at 480-81. We relied on that entrustment as evidence of the underlying trust relationship. Id. at 504-05. Nevertheless, we also pointed out that "[b]ecause of the discretion

8

Medicaid confers upon care providers . . . such providers owe a fiduciary duty to Medicaid.  <u>Indeed, we see it as paramount that Medicaid be able to 'trust' its service providers</u>."  <u>Id.</u> at 505 n.41 (citation omitted and emphasis added).

The facts of the present case are not significantly different. Conner was trusted (through his control of CTI) to properly report the medical necessity justifying ambulance service for Medicare and Medicaid patients.  Because of the nature of these vast government programs, it is essential to their functioning that trust be imposed on the service provider to capably and honestly determine in the first instance which patient transactions are entitled to reimbursement.  Otherwise, the added delay and expense might jeopardize the very existence of the programs.

We find that the district court did not err in applying the two-level enhancement.

### III.

Conner also contends that the district court erred in relying on the government's statistical evidence in determining the amount of loss.

The sentencing guidelines provide that in determining the amount of loss for the purpose of calculating the offense level in fraud cases, "[t]he court need only make a reasonable estimate of the loss.  The sentencing judge is in a unique position to assess

the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference." USSG § 2B1.1 cmt. n.3(C).

Much of the sentencing hearing below was devoted to the government's evidence as to the amount of loss. In its presentation, the government relied solely on CTI's Medicare reimbursement for non-emergency ambulance transportation of patients to obtain dialysis, for which CTI was paid $6,822,690.54 on 35,328 separate claims.

A random sample of 230 claims from the total population of such claims was examined by a medical fraud investigator, who determined that in all but fourteen of the claims there was no medical necessity for ambulance transport. A statistician, Suzanne Moody, Ph.D., testified that the extrapolation of these findings to the total number of claims produced a loss of $6,330,298, at a ninety percent confidence level.

The district court, after lengthy testimony by Dr. Moody, accepted the reliability of the sampling process, although the court did substantially reduce the loss figure urged by the government. The medical fraud investigator had fully disqualified sixty-five of the sample claims on the ground that no medical documentation existed. Because the district court found that the government had failed to show that the medical documentation had not been lost after the seizure of CTI's records, it treated those

10

sixty-five samples as legitimate, rather than disqualified. The final loss figure determined by the district court was $3,613,165.[4]

Conner's principal argument on appeal is that the samples used to extrapolate to the total loss figure were not examined for fraud, but only for medical necessity, and thus the government's evidence was unreliable. However, the evidence at trial adequately supported the finding that this loss was occasioned by the defendant's criminal conduct. The pervasive nature of the fraudulent scheme, as well as the methods used by Conner, justified the district court's attribution of fraud to all of the sample claims.

Extrapolation is an acceptable method to use in making a reasonable estimate of the amount of loss under the sentencing guidelines. See United States v. Pierce, 409 F.3d 228, 234 (4th Cir. 2005) (upholding calculation of fraud loss by extrapolating from the monthly averages for one period of years to another). Conner had an opportunity to present any contrary analysis of the claims sampled, but he did not do so. The district court did not err in its factual determination of the amount of loss.[5]

---

[4]The district court also slightly reduced the loss figure to account for dialysis trips made to and from hospitals, rather than nursing homes.

[5]Conner also argues that the sampling process was not shown to be random, but we find adequate support for the process in the expert's testimony concerning the computer program used to generate the sample claims.

IV.

For the reasons stated, the judgment below is

AFFIRMED.