# United States Court of Appeals

## For the Eighth Circuit

_____

No. 16-1175

_____

Jacques R. Slocum

*Petitioner - Appellant*

v.

Wendy Kelley, Director, Arkansas Department of Correction

*Respondent - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Pine Bluff

_____

Submitted: December 14, 2016
Filed: April 18, 2017

_____

Before WOLLMAN, SMITH,[1] and BENTON, Circuit Judges.

_____

SMITH, Circuit Judge.

Jacques R. Slocum was convicted in Arkansas state court of second-degree murder, endangering the welfare of a minor, and fleeing. He was sentenced to 99 years' imprisonment. After exhausting his state post-conviction relief remedies,

---

[1]The Honorable Lavenski R. Smith became Chief Judge of the United States Court of Appeals for the Eighth Circuit on March 11, 2017.

he filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging several claims of ineffective assistance of counsel. The district court[2] dismissed Slocum's habeas petition as procedurally defaulted but granted a certificate of appealability on whether Slocum had a substantial claim that his trial counsel was ineffective for failing to request a competency hearing and failing to present mitigating evidence during the sentencing phase. *See Martinez v. Ryan*, 132 S. Ct. 1309, 1320 (2012). Because we conclude that none of Slocum's ineffective-assistance claims have merit, we affirm the district court's dismissal of Slocum's § 2254 petition as procedurally defaulted.

## I. *Background*
### A. *State Proceedings*

On October 24, 2011, Slocum shot and killed Joe Jackson in front of several onlookers. Slocum was charged under Arkansas law with first-degree murder, felon in possession of a firearm, first-degree endangering the welfare of a minor, and fleeing. He hired LaTonya Austin as his trial attorney. Austin entered a general-denial defense on Slocum's behalf. A week before trial, Slocum retained a family friend, attorney Steve Smith, as Austin's co-counsel. After retaining Smith, Slocum changed his defense strategy to self defense.

At trial, Slocum did not contest that he killed Jackson; instead, he testified that he killed Jackson in self defense. Eyewitnesses Tina Williams and Tracy Brown testified to seeing Slocum in his car arguing with Jackson, who stood outside. The argument escalated, and Slocum got out of his car. At some point, Slocum got back in his car, grabbed a gun, and exited his car again. Slocum then shot Jackson twice, killing him. Slocum fired the fatal shots standing just outside of his vehicle with his two-year-old child in the backseat.

---

[2]The Honorable James M. Moody, Jr., United States District Judge for the Eastern District of Arkansas.

After shooting Jackson, Slocum entered his car and drove away. Police apprehended Slocum after disabling his car following a high-speed chase. Slocum's child experienced the entire incident from the backseat of the car. During the chase, Slocum discarded his gun.

On June 18, 2012, a Pulaski County Circuit Court jury found Slocum guilty of second-degree murder (the lesser-included offense); first-degree endangering the welfare of a minor; and fleeing. During the sentencing phase of trial, the State introduced victim-impact evidence and Slocum's conviction records—a Florida conviction for manslaughter and escape and a California conviction for felon in possession of a firearm. The State offered no details about Slocum's prior convictions, including the manslaughter conviction. Jackson's girlfriend, Erica Harris, testified that she was five months pregnant when Slocum killed Jackson and that her son was prematurely born as a result of the stress caused by Jackson's death. Harris showed a picture of her prematurely-born son to the jury. Slocum's defense team presented no mitigating evidence. During the sentencing-phase closing, the State argued that Slocum had "a violent history. He has taken another human life before he took Joe Jackson's [life]. . . . [O]ne human life is too much. And, now, it's been two at the hands of that man." The jury sentenced Slocum to the maximum penalty on all charges, and the court ordered all sentences to be served consecutively for an aggregate 99-year term of imprisonment.

On February 1, 2013, Slocum, through Austin, appealed his conviction to the Arkansas Court of Appeals, challenging the sufficiency of the evidence on his second-degree murder conviction. That court determined that Slocum's argument was not preserved for appellate review and affirmed the judgment on May 8, 2013. *See Slocum v. State*, 2013 Ark. App. 309 (2013). The mandate issued on June 5, 2013.

On July 18, 2013, Slocum filed a timely pro se petition for post-conviction relief in the Pulaski County Circuit Court under Arkansas Rule of Criminal Procedure

37 ("Rule 37"). In his pro se petition, Slocum alleged ineffective assistance of trial counsel. After holding a hearing on the petition, the state trial court denied relief on October 28, 2013. Slocum then appealed the denial of his Rule 37 petition to the Arkansas Supreme Court. On April 17, 2014, the Arkansas Supreme Court dismissed Slocum's appeal, holding that Slocum did not verify his original petition with the state trial court in accordance with Rule 37. *Slocum v. State*, 2014 Ark. 178, at *2–3 (2014) (per curiam). It held that the verification is "of substantive importance to prevent perjury" and thus the clerk should have rejected the petition. *Id*. at *2. As a result, it held that the state trial court lacked jurisdiction to consider the arguments raised in Slocum's Rule 37 petition. *Id*. at *3.

## B. *Federal Proceedings*

On April 30, 2014, Slocum filed his § 2254 petition with the district court, alleging ineffective assistance by both trial and appellate counsel. The magistrate judge recommended that the district court deny Slocum's petition with respect to his claims of ineffective assistance of appellate counsel but conduct an evidentiary hearing with respect to Slocum's claims of ineffective assistance of trial counsel. The magistrate judge recognized that the Arkansas Supreme Court's dismissal of Slocum's petition for failure to conform with the verification requirement of Rule 37 constitutes a "procedural default in an initial-review collateral proceeding." *See Martinez*, 132 S. Ct. at 1318. The magistrate judge found, however, that Slocum's pro se status during his postconviction proceedings *could* constitute cause to excuse the procedural default if his ineffective-assistance claims were *substantial*. *See id*. at 1320.

The district court adopted the magistrate judge's partial disposition. Thereafter, the magistrate judge held an evidentiary hearing on Slocum's claims that Austin, his trial attorney, was ineffective for, among other things, (1) failing to request a competency hearing, and (2) failing to present mitigating evidence during sentencing.

### 1. *Failure to Request a Competency Hearing*

At the evidentiary hearing, attorney Austin confirmed that she never requested a competency hearing before the state trial court. Slocum introduced exhibits showing that he had a series of mental evaluations by psychologists in the California Department of Correction (CDC), Florida Department of Correction (FDC), and the Arkansas State Hospital (ASH). Austin testified that she was unaware of these records. She confirmed that it was her "practice to question [her] clients as to their mental[-]health histories." Austin did not recall Slocum referencing his mental-health history. Austin confirmed that nothing about "Slocum's actions, speech, demeanor, [or] behavior . . . g[a]ve [Austin] any reason to suspect that he suffered from a mental disorder." During her initial interview with Slocum, Austin found him to be "intelligent." In fact, she found him "very articulate . . . in every hearing [that they] attended." She characterized him as "always active in his defense." In Austin's experience, "a client mentioning a difficult childhood" was an insufficient basis to request a competency hearing. Additionally, according to Austin, Slocum told her that he had a "nonviolent" criminal history. Austin observed no signs that Slocum was "mentally or emotionally" unable to assist with his trial "because he was actively involved." When asked what behavior of a client has previously led her to request a competency hearing, Austin testified, in relevant part, "I look at the offense. If the offense involves violence of some sort, that's somewhat of a red flag." But, according to Austin, she did not receive the certified copies of judgments from Slocum's California and Florida convictions until "three or four days before trial." Therefore, she "didn't know the full extent of all of [Slocum's] priors until, like, four days before trial."

Austin also testified that Slocum's wife, who retained Austin, never mentioned any concerns about Slocum's mental health. And Tim Boozer, a public defender who had originally represented Slocum, "gave [Austin] no indication . . . of any present mental disorder that would make [Slocum] incompetent to stand trial." Slocum confirmed that he "never" had a conversation with Smith—Austin's co-counsel and

Slocum's family friend—about Slocum's purported "mental health issues." No evidence exists in the record that Smith ever communicated to Austin that Slocum suffered from a mental illness.

Dr. Robert Forrest, a forensic psychiatrist, reviewed Slocum's CDC records to "determine whether they were or were not supportive of a mental disease at that time and then . . . how that may [have] play[ed] a role in the trial that occurred later on." In addition to the CDC documents, Dr. Forrest also reviewed medical records from the Arkansas Department of Correction (ADC) and the Pulaski County Regional Detention Facility, Slocum's state-court trial testimony, the transcript of Slocum's pro se Rule 37 hearing, and Slocum's federal habeas petition. Dr. Forrest testified that, based on these documents, his conclusion was that "although [Slocum] was provided medications at times and was diagnosed at times with varying different disorders, the [CDC] documents were not particularly supportive of the presence of a psychotic disorder." In his report, he opined "that during the time of his defense[,] Mr. Jacques Slocum did not demonstrate impairments in judgment, behavior, recognition of reality, or ability to meet ordinary demands of life that would lead another individual to have reasonable suspicion of a substantial disorder of thought, mood, perception, orientation, memory, or intelligence."

The magistrate judge rejected Slocum's claim that Austin was deficient for failing to request a competency hearing. The magistrate judge found no evidence supporting Slocum's testimony that Austin knew of his past mental problems. The magistrate judge pointed out that Smith—Slocum's family friend and Austin's co-counsel—never suggested that the defense move for a competency hearing.

### 2. *Failure to Present Mitigating Evidence*

During the evidentiary hearing, Slocum relied on the CDC, FDC, and ASH records in support of his claim that Austin was ineffective for failing to present mitigating evidence during the sentencing phase of his trial. According to these

records, Slocum endured an abusive childhood; suffered from post-traumatic stress disorder (PTSD) stemming from events resulting in his Florida manslaughter conviction; and was also diagnosed with psychosis and schizophrenia while incarcerated in California.

Slocum avers that his counsel should have presented to the jury evidence of his abusive childhood and how it mitigated his criminal actions. Slocum testified that he had a bed-wetting problem growing up and never had clean clothes. This caused him to go to school smelling bad. According to Slocum, his mother beat him for wetting the bed, and his classmates made fun of him because he smelled bad. As a result, Slocum started cutting classes and eventually dropped out of school in the sixth grade. Slocum testified that his mother beat him every day with Hot Wheel tracks, extension cords, broomsticks, shoes, and other implements. Slocum attributed some of this abuse to his having a different father than his mother's other three children.

Slocum testified that his experience with the law began at age ten when his mother had him arrested for stealing a Christmas present for her. When he got out of the juvenile facility, his mother committed him to a mental institution at age 11. At age 12, he went to live with a foster family temporarily before being put back into another institutional setting. He was placed into two more foster homes before moving back in with his mother at age 15. At age 16, Slocum moved out on his own. Slocum testified that he told Austin "the basics" about his traumatic childhood, admitting that the information that he gave her was not "as exten[sive]" as what he provided to the district court during the evidentiary hearing.

Austin testified that she did talk with Slocum about his "traumatic time spent in foster care and traumatic childhood." From that conversation, Austin learned that Slocum had "a rough childhood. He grew up in Chicago, was placed in foster care early on as a child, went to multiple homes . . . . [I]t was just not the best childhood that sort of led to a life of some bad choices." When a client provides her with

information about a "tough upbringing," Austin testified that her practice was to "use that as a talking point to build rapport with the client and tell them about [her] rough upbringing." She testified that a "rough upbringing alone doesn't really raise any red flags for [her]."

Austin also testified about the strategy devised for Slocum's sentencing. She and Smith initially planned for Slocum to testify at sentencing; but, as "things move[d] and evolve[d] in [the] trial," Austin and Smith decided it was "not the best move" for Slocum to testify. Austin identified "the topics that [Slocum] would have testified to at sentencing," including (1) Slocum's status as 49-year-old businessman with a wife and child who had "no real reason" to kill Jackson absent some justification, and (2) Slocum's foster care records. Austin confirmed that "[w]ithout foster care records and other witnesses," Slocum himself could have testified about his childhood at sentencing. According to Austin, she and Smith "did not develop an alternative strategy in the event that [Slocum] did not testify" at sentencing. Austin investigated no further because all Slocum had told her "was that he had a traumatic childhood and had been in foster care." Austin testified that she had no other information upon which to investigate, emphasizing that she lacked knowledge of what agency to even contact for a records search.

According to Austin, Slocum wanted to testify during the sentencing phase, just as he had testified in the guilt phase, but she advised him against it. Austin believed that the State would "butcher" Slocum if he testified. Austin suspected Slocum's credibility would be viewed dimly in light of his prior manslaughter conviction. Austin counseled Slocum that it would not be "wise" for him to testify, but she left the decision to Slocum. According to Austin, she, Smith, and Slocum collectively decided that Slocum not testify at sentencing. Austin acknowledged that without Slocum's testimony, the defense presented no mitigating evidence at sentencing.

Austin acknowledged that Slocum's wife would have been the "next best witness" to testify about Slocum's traumatic childhood and other mitigating factors. But, according to Austin, Slocum "adamantly did not want [his wife] to testify." Austin explained that Slocum did not permit his wife to attend trial because "he did not want the victim's family to even know what she looked like." Slocum feared "retaliation towards his family."

Despite Slocum presenting no mitigating evidence during sentencing, he "talked . . . a little bit about his rough childhood" during the guilt phase. Additionally, he discussed "being a father." When explaining why he fled the scene with his young son, Slocum stated that he had been a foster child and a ward of the state and did not want his son to have the same hardships. Slocum also testified during the guilt phase that he acted in self defense with no intention of hurting the victim.

The magistrate judge concluded that Slocum's claim that Austin was deficient for failing to present mitigating evidence lacked merit. The magistrate judge noted that although Slocum had told Austin that he "had a rough childhood and lived in two foster homes," he never mentioned any of the other mitigating evidence to Austin.

### 3. *Procedural Default*

The magistrate judge ultimately recommended that the district court deny Slocum's habeas petition as procedurally defaulted. However, the magistrate judge recommended that the district court "issue a certificate of appealability on the ineffective assistance of trial counsel claims for failure to request a competency hearing and failure to present mitigating evidence."

The district court adopted the magistrate judge's findings and issued the certificate of appealability.

-9-

## II. *Discussion*

On appeal, Slocum acknowledges that his § 2254 claims are procedurally defaulted[3] unless he can "show[] cause for the default and prejudice from a violation of federal law." *Martinez*, 132 S. Ct. at 1316. Relevant to this case, a "narrow exception" exists to the rule that "an attorney's ignorance or inadvertence in a postconviction proceeding does not qualify as cause to excuse a procedural default." *Id*. at 1315. "Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Id*. Errors during the collateral review process may provide cause to excuse a procedural default if, for example, "the State did not appoint an attorney to assist the prisoner in the initial-review collateral proceeding. The prisoner, unlearned in the law, *may not comply with the State's procedural rules* or may misapprehend the substantive details of federal constitutional law." *Id*. at 1317 (emphasis added). As a result, the Supreme Court has held that

> [w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a *substantial claim* of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

*Id*. at 1320 (emphasis added). To prove that the ineffective-assistance claim is *substantial*, "the prisoner must demonstrate that the claim has some merit." *Id*. at 1318.

---

[3]A procedural default occurs when "a state court has refused to review the complaint because the petitioner failed to follow reasonable state-court procedures." *Procedural-Default Doctrine*, Black's Law Dictionary (10th ed. 2014).

Here, the magistrate judge found that the Arkansas Supreme Court dismissed Slocum's pro se appeal for his failure to verify the petition. Consequently, the state trial court, according to the magistrate judge, "never had jurisdiction to hear the claim"; therefore, "Slocum's appeal was dismissed on a procedural default rather than on the merits." The magistrate judge concluded that "the *Martinez* exception is cause for Mr. Slocum's procedural default on these claims *if they are substantial*." (Emphasis added.) For purposes of this appeal, we will assume, without deciding, that this determination was correct and analyze whether Slocum has proven that his ineffective-assistance claims are *substantial*.[4]

To prove that his ineffective-assistance claims are substantial, Slocum must show that his counsel was deficient and that his counsel's deficient performance prejudiced him. *See Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984). To prove deficient performance, Slocum "must show that counsel's representation fell below an objective standard of reasonableness." *Id*. at 688. To prove prejudice, Slocum "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. "To satisfy *Strickland*, the likelihood of a different result must be 'substantial, not just conceivable.'" *Williams v. Roper*, 695 F.3d 825, 831 (8th Cir. 2012) (quoting *Harrington v. Richter*, 562 U.S. 86, 112 (2011)).

---

[4]On appeal, the State argues that the *Martinez* exception is inapplicable because Slocum *did* present his ineffective-assistance claims in the initial-review collateral proceeding before the state trial court. Alternatively, the State contends that the *Martinez* exception is inapplicable because Slocum never *initiated* a state collateral proceeding "because the verification attached to his Rule 37 petition was defective." Because we conclude that Slocum's claims fail under the *Martinez* exception, we need not address the State's alternative arguments.

## A. *Failure to Request a Competency Hearing*

Slocum claims that Austin was ineffective for failing to request a competency hearing. He avers that Austin had a duty to request a competency evaluation because she had a basis for a good-faith doubt about his competence. Slocum asserts that Austin's knowledge of the following facts should have raised a good-faith doubt in Austin's mind about Slocum's competence: (1) Slocum was charged with first-degree murder, a violent crime; (2) Slocum had a prior Florida conviction for manslaughter; and (3) Slocum had a traumatic childhood, which included foster-care placement. Slocum argues that these "red flags" should have prompted Austin to request a mental-health evaluation. The mental-health evaluation, in turn, would have revealed strong mitigating evidence. According to Slocum, requesting a competency hearing would have uncovered his CDC and FDC mental-health records.

Having reviewed the record, we conclude that Austin was not deficient for failing to request a competency hearing. No "objective indication [existed] that [Slocum] suffered from any mental illness." *See Gonzalez v. Knowles*, 515 F.3d 1006, 1015 (9th Cir. 2008) (rejecting petitioner's claim that trial counsel was constitutionally "ineffective at re-sentencing for failing to investigate potentially mitigating evidence of mental illness"). First, Austin testified that she did not recall Slocum telling her about his mental-health history, even though it was her "practice to question [her] clients as to their mental[-]health histories." Second, nothing about "Slocum's actions, speech, demeanor, [or] behavior g[a]ve [Austin] any reason to suspect that he suffered from a mental disorder." Austin described Slocum as "intelligent," "very articulate," and "always active in his defense." Third, Austin testified that, in her experience, "a client mentioning a difficult childhood alone" was an insufficient basis to request a competency hearing. Fourth, no other persons knowledgeable of Slocum's history ever mentioned that Slocum suffered from a mental disorder. Slocum's wife, who retained Austin, never mentioned any concerns about Slocum's mental health. Prior counsel Boozer never indicated to Austin that Slocum suffered from a mental disorder that would render him incompetent to stand

-12-

trial. And Smith, Austin's co-counsel and Slocum's family friend, never communicated any concerns to Austin, nor did Slocum ever discuss his mental health with Smith. For these reasons, Austin "cannot be deemed ineffective for failing to pursue this avenue of mitigation where [Slocum's] mental illness seemed unlikely." *See Gonzalez*, 515 F.3d at 1015.

Because Austin's performance did not fall below an objective standard of reasonableness, Slocum's claim that Austin was ineffective for failing to request a competency hearing fails. *See Worthington v. Roper*, 631 F.3d 487, 498 (8th Cir. 2011) ("Failure to establish either *Strickland* prong is fatal to an ineffective-assistance claim.").

### B. *Failure to Present Mitigating Evidence*

Slocum also argues that Austin was ineffective for failing to investigate and present evidence of his traumatic childhood as mitigating evidence during the sentencing phase of his non-capital trial. According to Slocum, Austin's knowledge of his abusive childhood should have prompted a reasonable investigation, which would have uncovered the depth of the abuse. He also maintains that the district court clearly erred in determining the extent of Austin's knowledge of Slocum's background, resulting in an erroneous legal determination. According to Slocum, Austin not only knew about Slocum's traumatic childhood but also knew that he was accused of a homicide—a clear indicator of possible mental health problems—and that the State would introduce the Florida manslaughter conviction as an aggravating sentencing factor. Slocum argues that this information obligated Austin to pursue leads into his background. As to the Florida manslaughter conviction, Slocum argues that Austin should have obtained the file, which would have revealed that he was horribly attacked, that the assailant stabbed him numerous times, and that he suffered PTSD from both the attack and the death of another person. Finally, Slocum asserts that Austin should have found an alternative source for presenting the substantial

mitigating evidence and that presenting no such evidence was not a reasonable strategy.

"The Supreme Court has enunciated the standards that apply to ineffective-assistance claims regarding the investigation into and presentation of evidence during the mitigation stage of death-penalty cases, but the Court has never decided a case enunciating the standards that apply during non-capital sentencing." *Johnson v. Beckstrom*, No. CIV.A. 08-194-ART, 2011 WL 1808334, at \*20 (E.D. Ky. May 12, 2011) (citing *Cullen v. Pinholster*, 563 U.S. 170 (2011); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor*, 529 U.S. 362 (2000)). Nonetheless, the Supreme Court has indicated that the ABA Guidelines serve as "guides to determining what is reasonable." *Wiggins*, 539 U.S. at 524 (quoting *Strickland*, 466 U.S. at 688).

> The ABA's Criminal Justice Standards . . . indicate that defense counsel in a noncapital sentencing proceeding should (1) promptly investigate the circumstances and facts relevant to sentencing, (2) present the court with any basis that will help achieve an outcome favorable to the defense, and (3) supplement or challenge information provided in any presentence report.

*United States v. Conner*, 456 F. App'x 300, 304 (4th Cir. 2011) (citing ABA Criminal Justice Standards 4–4.1(a) and 4–8.1(b)). Thus, trial "counsel ha[s] an obligation to conduct a thorough background investigation and to exercise reasonable, professional judgment in determining the mitigation evidence to present during the penalty phase of [a defendant's] trial." *Sinisterra v. United States*, 600 F.3d 900, 907 (8th Cir. 2010); *see also Williams*, 529 U.S. at 396 (stating that counsel has an "obligation to conduct a thorough investigation of the defendant's background." (citing 1 ABA Standards for Criminal Justice 4–4.1, commentary, p. 4–55 (2d ed. 1980))). "It is unquestioned that under the prevailing professional norms at the time of [Slocum's] trial, [Austin] had [this] 'obligation to conduct a thorough investigation of the

defendant's background.'" *See Porter v. McCollum*, 558 U.S. 30, 39 (2009) (quoting *Williams*, 529 U.S. at 396).

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690–91.

According to Austin, she, Smith, and Slocum collectively made the strategic decision that Slocum not testify during the sentencing phase. Austin advised Slocum against testifying out of concern that the State would attack Slocum's credibility, especially considering that the jury had already rejected Slocum's claim of self defense during the guilt phase. Slocum's refusal to permit his wife to testify about his background in the sentencing phase eliminated another source for mitigating evidence.

The question is "whether the investigation supporting [Austin's] decision not to introduce mitigating evidence of [Slocum's] background was *itself reasonable*." *See Wiggins*, 539 U.S. at 523. To answer this question, we focus on what evidence Austin had available to her about Slocum's history. *See id*. at 523–25 (holding that "[c]ounsel's decision not to expand their investigation beyond the PSI and the DSS records" in a capital case was deficient given that the PSI "included a one-page account of [the petitioner's] 'personal history' noting his 'misery as a youth,' quoting his description of his own background as '"disgusting,"'" and observing that he spent

-15-

most of his life in foster care" and the DSS records revealed that "[p]etitioner's mother was a chronic alcoholic; [the petitioner] was shuttled from foster home to foster home and displayed some emotional difficulties while there; he had frequent, lengthy absences from school; and, on at least one occasion, his mother left him and his siblings alone for days without food").[5]

Slocum provided Austin with "the basics" about his traumatic childhood. Slocum told Austin that he had a "rough childhood" in which he "was placed in foster care early on as a child" and "went to multiple homes." That was the extent of Austin's knowledge concerning Slocum's childhood. Austin testified that she had no other information upon which to investigate Slocum's childhood, emphasizing that she lacked knowledge of sources for additional information, such as pertinent state agencies. As discussed previously, Slocum's wife, Boozer, and Smith—all of whom had a history with Slocum—never mentioned that Slocum suffered from any mental-health issues stemming from his childhood or otherwise.

As to Slocum's prior convictions, Austin testified that she was aware of the convictions but did not get the certified copies of the judgments until "three or four

---

[5] *See also Rompilla*, 545 U.S. at 384 (holding that counsel was deficient in a capital case for failing to examine the petitioner's prior conviction file that was "a public document, readily available for the asking at the very courthouse where [the petitioner] was to be tried" in light of counsel's knowledge that the Commonwealth intended to seek the death penalty by proving that the petitioner had a significant history of violence and felony convictions through evidence and testimony concerning these prior convictions); *Porter*, 558 U.S. at 39–40 (holding that counsel was deficient in a capital case for failing to conduct a thorough investigation of the petitioner's background because counsel never conducted any investigation, such as "interview[ing] any members of [the petitioner's] family," and "ignored pertinent avenues for investigation of which he should have been aware" based on, for example, "[t]he court-ordered competency evaluations" that recounted the petitioner's history).

days before trial." Austin could not recall whether "there [was] a version of events contained in the Florida records that were introduced at sentencing." Nonetheless, it is undisputed that the State did not discuss the details of Slocum's prior convictions during sentencing.

On this record, we conclude that Austin provided constitutionally adequate assistance of counsel despite not presenting potentially mitigating evidence of which she had not been apprised. Unlike the counsel in *Wiggins*, *Rompilla*, and *Porter*, Austin had *no* materials providing her with leads to further investigate Slocum's childhood or the details surrounding his prior convictions. Furthermore, Slocum's main argument seems to be that Austin had an obligation to secure his *correctional and institutional records* from the CDC, FDC, and ASH, which discuss his abusive childhood and PTSD diagnosis stemming from the manslaughter conviction. As previously discussed, Austin had no reason to believe that Slocum suffered from a mental illness necessitating acquisition of Slocum's correctional and institutional records. To be sure, some diligent attorneys, following a hunch, may conceivably have sought and obtained Slocum's records in their representation, but that is not the standard for counsel under *Strickland*.

In summary, we hold that Austin's performance in failing to present any mitigating evidence during Slocum's sentencing did not fall below an objective standard of reasonableness. The record supports Austin's strategic decision not to have Slocum testify about mitigating evidence. Had Slocum testified, the State undoubtedly would have attacked Slocum's credibility and introduced the details of Slocum's prior crimes. Furthermore, because Slocum would not permit his wife to testify, Austin had no other witness through which to present mitigating evidence. Because Austin was not deficient, Slocum's claim that Austin was ineffective for failing to present mitigating evidence fails. *See Worthington*, 631 F.3d 487 at 498.

### III. *Conclusion*

Because none of Slocum's ineffective-assistance claims have merit, we conclude that the *Martinez* exception does not apply to excuse his procedural default. Accordingly, we affirm the judgment of the district court.

_____