NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0088n.06

No. 12-2649

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jan 31, 2014
DEBORAH S. HUNT, Clerk

ANTOINE JACKSON, )
)
    Petitioner-Appellant, )
v. )
)
GREG MCQUIGGIN, )
)
    Respondent-Appellee. )
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

**O P I N I O N**

BEFORE:    SILER, COLE, and COOK, Circuit Judges.

COLE, Circuit Judge.  To prevail in this habeas corpus action, Petitioner-Appellant Antoine Jackson must surmount the "doubly deferential" standards imposed by the Antiterrorism and Effective Death Penalty Act ("AEDPA") and *Strickland v. Washington*, 466 U.S. 668 (1984).  After a jury convicted Jackson in Michigan state court of arson, he was sentenced to seven to twenty years of imprisonment.  In this appeal, Jackson argues that his trial attorney provided ineffective assistance of counsel because she did not present a defense expert witness to refute the testimony of the prosecution's primary expert witness.  Claiming a violation of his Sixth Amendment right to the effective assistance of counsel, Jackson maintains that a defense expert would have undermined the prosecution's theory that he used an accelerant to start the fire intentionally.  The district court denied Jackson's habeas petition under 28 U.S.C. § 2254, and he now appeals.  Because the

Michigan Court of Appeal's decision was not "contrary to" or an "unreasonable application of" clearly established federal law, we affirm the district court's denial of the writ.

## I. BACKGROUND

**A.     The Facts**

Antoine Jackson and his girlfriend, Carrie Wilkinson, shared a two-story apartment in Taylor, Michigan. In 2006, Jackson allegedly set fire to the apartment using an unidentified accelerant. The day before the fire, the couple had an argument, and Wilkinson attempted to leave Jackson. After convincing Jackson that she would stay, Wilkinson secretly departed later that evening. Wilkinson escaped to her mother's house, and while there, she received numerous phone calls from friends and family indicating that Jackson was looking for her. When Jackson discovered Wilkinson's location, he drove to her mother's house and smashed his truck into a vehicle owned by Wilkinson's mother. Wilkinson called the Taylor Police Department, and an hour later an officer told her about the fire at her residence.

When investigators arrived at the apartment, the fire department was still extinguishing the blaze. Inspectors determined that the fire started on the first floor because there was heat and smoke damage on the second level.

Jackson was charged with arson of a dwelling house, in violation of Mich. Comp. Laws § 750.72. The circumstantial evidence against him was overwhelming. Jackson was the only person other than Wilkinson with a key to her apartment, he had previously threatened to burn down the apartment, he had gone to a relative of Wilkinson's the day of the fire looking for a gun to "kill [his] bitch," and Jackson was the last person seen leaving the apartment shortly before the fire.

At Jackson's trial, John Hager, the fire marshal for the City of Taylor, testified as the prosecution's expert witness. Hager's testimony is relevant because Jackson's ineffective assistance claim turns on whether his trial attorney was deficient in failing to offer a defense expert to challenge Hager's conclusions. After the fire, Hager investigated Wilkinson's apartment and observed that one of the burners on the kitchen stove was in the "on position," although he did not find any pots or pans containing burn marks. While the kitchen sustained severe fire damage, Hager determined that the fire started in the living room and identified the specific point of origin as the right-hand side of the couch. His findings were based on burn patterns on the drywall, the charring of the couch itself, and smoke and heat travel patterns.

After determining the origin of the fire, Hager washed down the dining and living room floors, which revealed "abnormal burn patterns." According to Hager, these patterns indicated that an accelerant had been poured on the carpet. Hager then requested a canine accelerant detection unit to help pinpoint the cause of the fire. As the dog and his handler, Raymond Wlosinski, surveyed the damaged apartment, the dog did not indicate that an accelerant had been used. Furthermore, Wlosinski's post-investigation report acknowledged that the dog did not identify the presence of an accelerant. But later, during cross-examination, Wlosinski unexpectedly testified that the canine did in fact indicate, and that he accidentally omitted this from his report.

Hager collected four samples of carpeting from Wilkinson's apartment, and the Michigan State Police crime lab analyzed them. The parties stipulated that the carpet samples did not show that an accelerant had been used, but Hager maintained that the irregular burn patterns indicated that the fire had been intentionally set using an ignitable liquid. Dismissing the possibility that the fire

was an accident, Hager suspected that windshield washer fluid had been used because he found an unopened container of washer fluid in Wilkinson's apartment. Based on this finding, Hager suggested that a second container of washer fluid could have been used to start the fire. Hager further posited that if the fluid contained alcohol, the canine unit may have been unable to detect an accelerant as it could have evaporated, been consumed in the fire, or been washed away.

Jackson did not present any witnesses at trial, and a jury convicted him of one count of arson of a dwelling house. Because Jackson was a second habitual offender, he was sentenced to seven to twenty years of imprisonment.

## B. **Procedural History**

### *1. State Court Appeals*

On direct appeal, Jackson moved for a new trial, arguing that his trial lawyer, Rose Mary Robinson, failed to challenge the scientific validity of Hager's conclusions concerning the cause and origin of the fire. The Michigan Court of Appeals remanded the case for a post-conviction *Ginther* hearing to determine whether there was evidence to substantiate Jackson's ineffective assistance claim. Two witnesses testified at this evidentiary hearing: Jackson's trial counsel and Dennis Smith, a defense expert with thirty years of experience investigating fires. Robinson explained to the trial judge why she thought expert testimony was unnecessary. She claimed that the prosecution could not prove that an accelerant had been used because neither the crime lab report nor the canine accelerant detection unit indicated the presence of an accelerant. Robinson testified that she did not want to confuse the jury or needlessly distract them by presenting competing authorities. She also indicated that, in her experience, juries tend to favor prosecution witnesses when experts testify.

At the *Ginther* hearing, defense expert Dennis Smith testified that Hager deviated from the standard protocols for fire investigations contained in the National Fire Protection Association ("NFPA") 921. Smith insisted that there was no physical evidence to support Hager's conclusion that the fire was caused by an accelerant. Smith said it was "possible" that the fire started as a result of a pot left on the stove, based on specific burn patterns moving from the kitchen to the living room.

At the conclusion of Robinson's and Smith's testimony, the prosecution made an offer of proof that it was prepared to offer an additional expert to substantiate Hager's conclusions that an accelerant had been used. In light of the "technical aspects of this case," the trial court denied Jackson's motion for a new trial, explaining that Robinson's justifications for not obtaining a defense expert were reasonable. Even if Jackson employed a defense expert, the trial court concluded, the result of the trial would not have been different.

The Michigan Court of Appeals affirmed Jackson's conviction and held that Robinson's decision to refrain from hiring an expert witness was legitimate, given that the scientific evidence contradicted Hager's conclusions. According to the state court, Jackson did not demonstrate that Robinson was ineffective, nor did he establish outcome-determinative prejudice.

Raising the same ineffective assistance claim previously argued, Jackson appealed to the Michigan Supreme Court, which summarily denied leave.

*2. Federal Habeas Review*

Jackson then petitioned for habeas corpus relief under 28 U.S.C. § 2254. He argued that the state trial court deprived him of a fair trial by failing to keep "junk science" from the jury and that his defense counsel was ineffective because she did not present a defense expert at trial. In denying

Jackson's habeas petition, the district court described Robinson's overall representation as "active and capable." While the court agreed that counsel could have offered an expert witness, it ultimately held that Robinson's decision not to call a defense expert was reasonable because the scientific evidence did not support the arson charge. The district court, however, granted a certificate of appealability on Jackson's ineffective assistance claim. Jackson timely filed a notice of appeal. We have jurisdiction under 28 U.S.C. § 2253(a) to review the district court's decision.

## II. ANALYSIS

### A. Standard of Review

AEDPA limits the power of federal courts to grant habeas corpus relief. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). Under 28 U.S.C. § 2254(d), a petitioner may not obtain relief on any claim that was adjudicated on the merits in state court unless adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The phrases "contrary to" and "unreasonable application of" have independent meanings:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412–13 (2000).

Jackson was convicted in state court; therefore, AEDPA's stringent standard of review applies to all federal claims the state court reached on the merits. The Michigan Court of Appeals analyzed Jackson's ineffective assistance claim under state law that mirrors the Sixth Amendment standard articulated in *Strickland*—and is at least as protective as *Strickland*. *Compare People v. Toma*, 613 N.W.2d 694, 703 (Mich. 2000) (to prove ineffective assistance of counsel, a defendant must establish that counsel performed below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's error, the result of the proceeding would have been different), *with Strickland*, 466 U.S. at 687 (same). As to ineffective assistance claims, Michigan law "fully incorporat[es] a related federal constitutional right" and is "generally coextensive with" the federal law. *See Johnson v. Williams*, 133 S. Ct. 1088, 1094–95 (2013) (citation and internal quotation marks omitted). When this situation occurs, we can presume, subject to rebuttal, that the Michigan Court of Appeals adjudicated this claim on the merits. *Id.* at 1091. Because Jackson has not negated this presumption, AEDPA governs.

We consider the "last reasoned state court opinion" to determine whether relief is appropriate under AEDPA. *See Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (citation and internal quotation marks omitted). To warrant relief, there must be

an error in the state court's ruling that was "so lacking in justification that there was an error . . .

beyond any possibility for fairminded disagreement." *Id*. at 786–87.

The "clearly established Federal law" applicable in this case is *Strickland v. Washington*—an

admittedly "high bar" to surmount. *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). When

*Strickland* and § 2254(d) apply in concert, federal courts must employ a "doubly deferential"

standard of review, which creates a "formidable barrier" to habeas relief. *See Burt v. Titlow*, 134

S. Ct. 10, 16 (2013); *Pinholster*, 131 S. Ct. at 1403 (citation omitted). In other words, we "take a

highly deferential look at counsel's performance through the deferential lens of § 2254(d)."

*Pinholster*, 131 S. Ct. at 1403 (citation and internal quotation marks omitted). Our task is not to

evaluate Jackson's claim as if it were being analyzed in the first instance; "AEDPA demands more."

*Richter*, 131 S. Ct. at 786. Instead, Supreme Court precedent instructs federal courts to determine

"what arguments or theories supported or . . . could have supported" the state court's conclusion.

*Id.*

Affording both the state court and defense counsel the benefit of the doubt, we affirm the

district court's denial of the writ.

**B. Ineffective Assistance of Trial Counsel**

We first describe the familiar standard under *Strickland* and then consider whether the

Michigan Court of Appeals unreasonably applied it.

To obtain relief in state court, Jackson had to establish two conditions: that his attorney's

"performance was deficient" and that he was prejudiced as a result. *Strickland*, 466 U.S. at 687.

An attorney's representation is deficient if her performance "fell below an objective standard of

reasonableness." *Id.* at 688. The touchstone for examining ineffectiveness claims "must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id*. at 686. In addition, there is a "strong presumption" that counsel acted within the "wide range" of representation permitted under the Sixth Amendment. *Id.* at 689.

With respect to prejudice, Jackson must show that his attorney's errors were so serious that he was deprived of a fair trial. *Id.* at 687. There must be a "substantial," not simply "conceivable," chance of a different result. *Richter*, 131 S. Ct. at 792. The key inquiry is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

### 1. *Deficient Representation Under* Strickland

The Michigan Court of Appeals did not unreasonably apply *Strickland*. Characterizing Robinson's decision to forgo expert testimony as one involving "trial strategy," the state court did not question her approach. The court credited Robinson's understanding that the prosecution did not have the scientific evidence to prove that an accelerant had been used, rendering an expert defense witness unnecessary. The court further recognized that Jackson's proposed fire expert at the *Ginther* hearing could not rule out arson. It was defensible, in the court's view, for Robinson not to present expert testimony, as it might have confused the jury, undermined the defense's credibility, or biased the jury in favor of the prosecution's expert witness.

Testimony from the post-conviction *Ginther* hearing provides considerable support for the reasonableness of the state court's decision. The record shows that Robinson requested a *Daubert*

hearing to challenge Hager as an expert witness because he hypothesized that the fire was intentionally set, but there was no evidence to substantiate his assertion. Robinson also sought to attack Hager by showing that he deviated from NFPA 921, the standard protocol for fire investigations. To prepare for the *Daubert* hearing, Robinson consulted an arson expert, who advised her on what to look for while cross-examining Hager. Although Hager's conclusions were undermined by the crime lab and accelerant unit reports, the trial court admitted his testimony anyway. These contradictions, in the court's view, concerned the weight the jury might give Hager's testimony, rather than its admissibility. While Robinson's *Daubert* motion was unsuccessful, she continued to mount Jackson's defense.

Robinson read numerous articles about arson, studied resources from the Innocence Project on burn patterns, and reviewed NFPA 921 in anticipation of trial. Jackson criticizes her for not printing a physical copy of NFPA 921 to reference, although he admits that the document is hundreds of pages long. Jackson argues that it was unreasonable for Robinson to rely on her memory when cross-examining Hager about NFPA 921. His critique is in vain because defense counsel is not required to print a lengthy publication in order to conform to Sixth Amendment precepts. While the Supreme Court has not articulated precise instructions for appropriate attorney conduct, the Court has emphasized that "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. By reading numerous articles about arson, reviewing police reports and pictures of burn patterns, and familiarizing herself with NFPA 921, the state court's finding of effective assistance was not "lacking in justification."

Robinson also prepared for trial by consulting several defense attorneys, one of whom represented a client charged with felony murder arson. Their advice aligned with her professional judgment that expert testimony was unnecessary because of problems with the scientific portion of the prosecution's case. Robinson knew the prosecution had to prove that Jackson intentionally set fire to Wilkinson's apartment using an accelerant. In fact, she anticipated the need to call an expert witness, but after considering the discovery material she concluded that the prosecution could not marshal the necessary evidence to satisfy its burden of proof. While Hager testified that the fire started on the couch, according to Robinson, there was no evidence to "corroborate what he was saying." These shortcomings in the prosecution's case led her to conclude that the prosecution could not prove that Jackson used an accelerant.

Jackson argues that Robinson failed to investigate adequately *before* deciding to forgo expert testimony. In *Strickland*, the Supreme Court explained that counsel is obligated to reasonably investigate or to make a reasonable determination that renders certain investigations unnecessary. *Strickland*, 466 U.S. at 690–91 ("In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."). When Robinson decided against hiring an expert, she knew that the crime lab results and the report from the accelerant detection unit directly contradicted Hager's findings. Beyond this, she determined that expert testimony might have "confuse[d] the jury" or "cloud[ed] the record" with highly technical information. Concerned that this evidence would needlessly distract the jury, she elected not to "shift attention to esoteric matters of forensic science . . . or transform the case into a battle of the experts." *Richter*, 131 S. Ct. at 790. In fact,

- 11 -

presenting a defense expert to challenge Hager's conclusions would have likely prompted rebuttal testimony by the prosecution to substantiate Hager's theories. Armed with objective evidence that the fire was not caused by an accelerant, it was not unreasonable for Robinson to "draw a line" because, in her judgment, further investigation would have been unprofitable. *Rompilla v. Beard*, 545 U.S. 374, 383 (2005).

Robinson even discussed with Jackson why forgoing expert testimony was prudent, and he agreed to waive calling a defense expert. Jackson's decision to proceed without such testimony is not dispositive, but it does cut against his ineffectiveness claim since he was briefed on the relevant facts and concurred in Robinson's proposed course of action. In particular, "[w]here a defendant, fully informed of the reasonable options before him, agrees to follow a particular strategy at trial, that strategy cannot later form the basis of a claim of ineffective assistance of counsel." *United States v. Weaver*, 882 F.2d 1128, 1140 (7th Cir. 1989); *see also United States v. Williams*, 631 F.2d 198, 204 (3d Cir. 1980) (holding there is no ineffective assistance of counsel where the defendant ultimately concurred in his trial counsel's tactical decision). Nothing in the record suggests that Jackson misunderstood Robinson's assessment of the evidence or establishes that he disagreed with her decision—at least until he was convicted. But as the Supreme Court has warned, "[i]t is all too tempting to second-guess counsel's assistance after conviction or adverse sentence." *Strickland*, 466 U.S. at 689.

Finally, Robinson elicited important concessions from Hager on cross-examination. Hager conceded that the irregular burn patterns could have been caused by something other than an accelerant. He further admitted that he did not smell gasoline at the apartment and did not see any

gasoline cans, paint thinners, or ignition devices in the apartment, which would have suggested that an accelerant had been used. Robinson elicited testimony that Hager did not ask the police whether Jackson had sustained burn injuries, although this is a common indicator that an accelerant had been used. Jackson argues that relying on cross-examination was inadequate to refute the validity of Hager's testimony. Endorsing a contrary view, the Supreme Court has held that "[i]n many instances *cross-examination will be sufficient* to expose defects in an expert's presentation. When defense counsel does not have a solid case, the best strategy can be to say that there is too much doubt about the State's theory for a jury to convict." *Richter*, 131 S. Ct. at 791 (emphasis added). Neither *Strickland*, nor any other clearly established federal law, requires defense counsel to provide expert testimony when there are other reasonable methods—like cross-examination—to represent a client. Indeed, counsel is not automatically compelled to call an expert witness for every prosecution witness that testifies. *Id.* Given the absence of evidence before trial that an accelerant had been used, Robinson decided to expose weaknesses in the prosecution's case. This, in our view, supports the state court's finding of effective assistance, at least under these facts.

Jackson highlights several circuit court decisions in which attorney representation was deemed unreasonable because counsel did not call expert witnesses or failed to make informed decisions once experts were hired. *See Dugas v. Coplan*, 428 F.3d 317 (1st Cir. 2005); *Richey v. Bradshaw*, 498 F.3d 344 (6th Cir. 2007). His reliance on these cases is unavailing because the Supreme Court has repeatedly cautioned that "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.' [Circuit precedent] therefore cannot form the basis for habeas relief under AEDPA." *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012).

It is also incorrect to use circuit precedent to transform a broad principle proclaimed by the Supreme Court into "a specific legal rule that [the] Court has not announced." *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450 (2013). When *Strickland* applies, as it does here, courts have "more leeway . . . in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). Put differently, the range of reasonable applications is substantial when *Strickland* applies. *See Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Accordingly, we must not hastily question the judgment of the Michigan Court of Appeals, particularly given this evidentiary record. *See Renico v. Lett*, 559 U.S. 766, 779 (2010). Robinson considered the gains and losses associated with hiring an expert, she educated herself on principles of arson investigation, consulted with an arson expert, conferred with defense attorneys, and elicited concessions from Hager on cross-examination. The Supreme Court has noted the difficulty in "establish[ing] ineffective assistance when counsel's overall performance reflects active and capable advocacy." *Richter*, 131 S. Ct. at 791. Examining all of Robinson's actions in representing Jackson, the state court's decision is not "so lacking in justification" that it should be set aside. *Richter*, 131 S. Ct. at 786–87.

   *2. Prejudice Under* Strickland

   Even if counsel's performance was constitutionally deficient, Jackson cannot show that the state court's decision finding no prejudice was an unreasonable application of federal law.

   Acknowledging the substantial circumstantial evidence against Jackson, and recognizing that his own defense expert at the *Ginther* hearing could not rule out arson, the state court held that Jackson could not show a substantial likelihood that the jury would have found him not guilty. Jackson claims that an arson expert would have provided scientific evidence to support the defense

position that the fire was not intentionally set. But even if a defense expert witness had cast doubt on the validity of the prosecution's expert, the circumstantial evidence against Jackson could have allowed the jury to find beyond a reasonable doubt that he intentionally started the fire. Consider the evidence against Jackson: He previously threatened to burn down Wilkinson's apartment when they argued in the past. On the night of the fire, he had gone to a relative of his girlfriend seeking a gun to kill Wilkinson. He smashed Wilkinson's mother's car the day before the fire. He was the only person other than the victim with a key to her apartment. In addition, Wilkinson's neighbor testified that Jackson was the last one seen leaving the apartment, hours before the fire. Even assuming that Robinson inadequately cross-examined Hager regarding his methodological deviations from NFPA 921, or failed to present an ideal defense, Jackson still cannot establish outcome-determinative prejudice.

As the Supreme Court has most recently advised in *Burt v. Titlow*, deference should be granted to state court decisions particularly where a case concerns "such a common claim as ineffective assistance of counsel under *Strickland*—a claim state courts have now adjudicated in countless criminal cases for nearly 30 years." 134 S. Ct. at 15. Here, there was no extreme malfunction in state court, nor was there an error so fundamental to cast doubt on the fairness of Jackson's trial. In essence, Robinson's decision to forgo expert testimony was the product of trial strategy, and thus "virtually unchallengeable." *Strickland*, 466 U.S. at 690.

### III.  CONCLUSION

For the reasons stated above, the district court's denial of Jackson's habeas petition is affirmed.